## DUKE P. KAHANAMOKU *v.* ADVERTISER PUBLISHING COMPANY, LIMITED, AN HAWAIIAN CORPORATION.

### No. 1277.

EXCEPTIONS FROM CIRCUIT COURT FIRST CIRCUIT.

ARGUED DECEMBER 7, 8, 1920.        DECIDED DECEMBER 22, 1920.

COKE, C. J. KEMP AND EDINGS, JJ.

LIBEL AND SLANDER—*pleading—falsity of publication need not be alleged.*

It is not necessary for the plaintiff in a civil action for libel to allege the falsity of the libelous publication, but if the defendant desires to justify the publication by showing it to be true that comes in as a defense under a proper pleading in his behalf.

SAME—*same—special damages when not necessary.*

If the publication complained of is libelous *per se* special damages need not be alleged or proven but general and punitive damages may be recovered.

SAME—*publication libelous per se when.*

If the language used of and concerning the plaintiff (when construed to mean what persons of ordinary intelligence reading it would reasonably understand it to mean) would tend to render him contemptible or ridiculous in public estimation or expose him to public hatred or contempt it is libelous *per se.*

SAME—*same.*

To publish of a person that he has not a sufficient job because he is a loafer or a slacker is libelous *per se* as such a charge tends to subject the person charged to social degradation and to the contempt of all right thinking people.

OPINION OF THE COURT BY KEMP, J.

The plaintiff Duke P. Kahanamoku instituted this action for libel against the Advertiser Publishing Company, Limited. The defendant interposed a demurrer to the complaint which was by the circuit court overruled

and the matter is here on an interlocutory bill of exceptions to the order overruling the demurrer. The essential part of the complaint follows:

"2. That plaintiff above named, Duke P. Kahanamoku, was at all times hereinafter mentioned and now is, a resident of Honolulu aforesaid, a citizen of the United States of America and of the Territory of Hawaii. That plaintiff was at all times hereinafter mentioned and now is an amateur athlete, a member of the Amateur Athletic Union of America, generally known as the A. A. U., a swimmer of great renown and widely known throughout the Territory of Hawaii and among the people thereof. That plaintiff was at all times hereinafter mentioned and now is widely known and of great renown as an athlete and swimmer throughout the United States of America, the Territory of Hawaii, Australia, New Zealand, in Europe and elsewhere. That plaintiff is the holder of many records, including world's records for swimming and did compete in the Olympic Games as a representative of the United States of America in the year 1912, with great success.

"3. That at Honolulu, aforesaid, on the 29th day of October, 1919, the defendant, said Advertiser Publishing Company, Limited, viciously and maliciously and for the purpose of injuring the reputation, character, fame and good name of the plaintiff herein, and for the purpose of bringing said plaintiff into disgrace, abhorrence, odium, hatred, contempt and/or ridicule, among the people of the Territory of Hawaii, the United States of America, and the people elsewhere, and for the purpose of causing said plaintiff to be excluded from the society of said peoples, and with the intent wickedly, viciously and maliciously to injure said plaintiff personally in his good name, fame, reputation and character, as a swimmer, amateur athlete and otherwise, did publish or cause or procure to be published in 'The Pacific Commercial Advertiser' aforesaid, of and concerning said plaintiff personally, as a swimmer, as an amateur athlete and otherwise, certain libelous and defamatory words, matters and things as follows:

" 'DUKE P. KAHANAMOKU QUITS COLD.
'ONE TIME IDOL AND WORLD'S
CHAMPION OUT OF SWIM MEET.

'The Duke has quit cold. (Meaning and intending thereby the said plaintiff, Duke P. Kahanamoku, and that said Duke P. Kahanamoku had quit cold, and was and is a quitter, a coward and a poor sport.)

'Faced with the stiffest competition in the world in a swimming meet which has attracted attention wherever swimming is popular, he has refused to enter the Fall Swimming Meet after Norman Ross, 'Stubby' Kruger, George and Frances Cowles Schroth have been brought thousands of miles to meet the local talent in what promises to be one of the finest aquatic carnivals held in the Islands.

'The man who has received local and even world-wide adulation, pages of publicity and many honors, whose picture is featured on the Hawaii Tourist Bureau booklets and letterheads, has pleaded muscles hardened from rowing that prevent his being at top standard.

'Duke Kahanamoku is a swimmer. He has received his honors for swimming. He knew the Fall Swimming Meet was planned long before the regatta. He knew that he would be expected to lead the representatives of Hawaii in the carnival. He went into rowing and now he is not willing to stand the gaff. (Meaning and intending thereby the said plaintiff, Duke P. Kahanamoku, and that said plaintiff was and is a coward and a quitter and a poor sport and afraid of competition and not willing to stand the gaff and not willing to stand competition.)

'VISITORS GOOD SPORTS.

'The visiting swimmers have shown themselves good sports. They have entered generously so that the public can see them swim in many races. The local swimmers, except Duke, are doing their parts. He sulks in his tent and talks about muscles. What he needs is backbone. (Meaning and intending thereby the said plaintiff, Duke P. Kahanamoku, and that said plaintiff was and is a poor sport and was and is a coward without backbone, a quitter and not willing or able to stand competition.)

'The sporting editor of this paper was approached by members of the swimming committee and asked whether he would protect the Duke in case the latter was a good sport and entered, despite ·the muscles.  The reply was that, if it were shown that the Duke was really handicapped by 'rowing muscles' or was in poor condition, this paper would be glad to recognize his sportsmanship, say in advance that he was in the condition which he was proven to be in, and in case of his defeat, call attention again to the facts, without detracting from the work of the winner.

'But that was evidently not enough for the Duke, if the committee reported it to him.  He did not prove to be so much of a sport, so the truth is now clear.  (Meaning and intending thereby the said plaintiff, Duke P. Kahanamoku, and that said plaintiff was and is a poor sport, a coward, a quitter, a man without backbone, and unable and unwilling to stand competition.)

### WOULD HIDE FACTS.

'When it became known that the Advertiser meant to tell the public the facts about the failure of Duke to enter the coming meet, some of the committee members pleaded that it would hurt the sport.

'To them the Advertiser replies that for Hawaii not to repudiate Duke's action will hurt the sporting reputation of the Islands far more.  The quitting of Duke will be heralded far and wide in the press.  The wireless will carry it to the mainland papers and correspondents will write of it.  The swimmers will take back the word.  Our whole program intended to make the Crossroads of the Pacific the swimming capital of the world, will fall like a pack of cards when it is known that our swimming idol has feet of clay and that we are too blind to see it. (Meaning and intending thereby the said plaintiff, Duke P. Kahanamoku, and that said plaintiff has cold feet or feet of clay, and that said plaintiff was and is a quitter, a coward, a person without backbone, a poor sport, and unable and unwilling to stand competition.)

'We owe it to our swimming guests to show them that

their sportsmanship is recognized and that we demand no less of our own.

'Some of the committee say that Hawaii has done very little for the Duke.   Since when has it become the thing that the world owes an amateur athlete a living for his sport?   If it does, the structure of amateur sport falls in ruin.   After the present denouement who will have the hardihood to say that Hawaii owes the Duke anything?

'A SILLY EXCUSE OFFERED.

'Others of the committee excuse the Duke's failure to come across with a clean cut action, and his lack of a sufficient job by saying that he 'is a Hawaiian.'

'The Advertiser protests in the name of the Hawaiian people, whose members are self-supporting and many of whom are well-to-do.   The race has too much self-respect to let a slur like that go unchallenged.   The Hawaiian people will be among the last to back up a slacker or a loafer, whoever he may be.   (Meaning and intending thereby the said plaintiff, Duke P. Kahanamoku, and that said plaintiff was and is a slacker, a loafer, unworthy to be a person of Hawaiian blood and Hawaiian descent, a coward, a man without backbone, a poor sport, a quitter and a person unwilling and unable to stand competition.)

'The Duke has had his chance and he has passed it up. The chance of his being sent to the Olympics in 1920 is gone and Hawaii will be ready to welcome some new swimming idol who is worthy to represent her in the water.   (Meaning and intending thereby the said plaintiff, Duke P. Kahanamoku, and that said plaintiff was and is a slacker, a loafer, unworthy to be a person of Hawaiian blood and Hawaiian descent, a coward, a man without backbone, a poor sport, a quitter and a person unwilling and unable to stand competition, and generally of such low character as to be unworthy to represent the Territory of Hawaii as a swimmer and amateur athlete.)'

"That said defendant, Advertiser Publishing Company, Limited, by the aforesaid libelous article, words, matters and things, did maliciously, viciously and wickedly mean and intend to charge said plaintiff, Duke P.

Kahanamoku, and did charge said plaintiff thereby falsely, with being a quitter, a coward, a poor sport, a person afraid of competition and not willing or able to stand competition, a person without backbone, a person with cold feet or feet of clay, a slacker, a loafer, an Hawaiian unworthy to be of Hawaiian blood and Hawaiian descent and a person unworthy to represent the Territory of Hawaii as a swimmer and amateur athlete. That said libelous article, words, matters and things aforesaid, were published and printed or caused or procured to be published and printed as aforesaid, upon page 6 of 'The Pacific Commercial Advertiser' aforesaid, which said page is known as the Sporting page of said newspaper, of and concerning the said plaintiff, his character, person and reputation as an amateur athlete, a citizen of the Territory of Hawaii, an Hawaiian and otherwise. That said libelous article, words, matters and things aforesaid, were circulated throughout the Territory of Hawaii and elsewhere by said defendant corporation, for the same purpose and with the same intent as the same were published, printed or caused or procured to be published and printed in said newspaper by said defendant corporation as aforesaid.

"4. That said libelous article, words, matters and things as published and printed or caused or procured to be published and printed and circulated by the said defendant corporation as aforesaid, were published, printed and circulated by said defendant corporation maliciously and without legal or any cause or excuse, and such words, matters and things wherein and whereby in said libelous article and publication, said plaintiff is charged and accused with being a quitter, a coward, a poor sport, a person afraid of competition and not willing or able to stand competition, a person without backbone, a person with cold feet or feet of clay, a slacker, a loafer, an Hawaiian unworthy to be of Hawaiian blood and Hawaiian descent and a person unworthy to represent the Territory of Hawaii as a swimmer and amateur athlete, were and are absolutely false and untrue.

"5. That by reason of said false, malicious and libelous publications so published as aforesaid, and circulated as aforesaid, by said defendant corporation, said plaintiff has suffered great injury to his fame, reputation and good name, and has been brought into disgrace, abhorrence, odium, hatred, contempt and/or ridicule and has been excluded from the society of divers persons in the Territory of Hawaii and elsewhere, and has suffered great grief and mental anxiety, and has been deprived of much sound sleep and has lost much valuable time, and has been otherwise greatly injured and damaged. That said plaintiff has been damaged and has suffered damage as aforesaid in the sum of Thirty Thousand Dollars ($30,000.00). Plaintiff further claims the sum of Twenty Thousand Dollars ($20,000.00) as and for punitive damages against said defendant corporation."

The grounds of the demurrer on which defendant relies are as follows:

"1. That said complaint fails to set forth facts sufficient to constitute a cause of action in this:

"(a) That the alleged publication in 'The Pacific Commercial Advertiser' of October 29, 1919, is not libelous;

"(b) It nowhere appears in and by said complaint that the plaintiff was specially or at all damaged by the publication of the alleged libelous article.

"2. That said complaint fails to disclose any facts upon which might be predicated the claim for punitive damages."

The demurrer as presented in the circuit court contained other grounds but they have not been insisted upon here. We have examined them, however, and find them without merit.

Under the grounds of the demurrer above set out and which the defendant insists are well taken it is argued that the article in question does not exceed the bounds of "fair criticism or comment," that it is not libelous *per se* and that plaintiff having failed to allege special damages there is no basis for a claim for punitive damages.

The demurrer of course admits the truth of every allega-
tion of fact contained in the complaint but defendant's
counsel contend that because of the peculiar allegation of
falsity contained in the complaint the facts stated in the
article, as distinguished from what they term comment
and expression of opinion upon the facts, are admitted
to be true and invoke the rule that comment upon admit-
ted facts cannot constitute libel. This contention is based
on the assumption that a complaint which fails to allege
the falsity of the publication is demurrable and on this
assumption much of defendant's argument is predicated.

Without deciding whether plaintiff has alleged the
falsity of all or only a part of the article of which he
complains we think that there is no ground for holding
that he has admitted the truth of any part thereof. In
the proofs at the trial the plaintiff is not called upon to
show the falsity of the article or any part of it, but if
defendant desires to justify the publication by showing
it to be true that comes in as a defense under a proper
pleading in his behalf. This being true the averment of
falsity should not be required and whatever the rule may
be elsewhere it was held by this court as early as 1884
in *Waterhouse* v. *Spreckels,* 5 Haw. 246, that it is not
necessary for the plaintiff to allege the falsity of the
libelous article. So far as we are aware this holding has
never been overruled and we think it is sound in prin-
ciple, for if plaintiff is not required to prove the falsity
we see no reason why he should be required to allege it.
We are not unmindful of the fact that at common law
it was usual and probably necessary to allege the falsity
of the libelous publication, but in adopting the common
law here we did not adopt such of it as had theretofore
been rejected by Hawaiian decisions. To the contrary
such Hawaiian decisions were given the force of a
statute. *The Schooner Robert Lewers* v. *Kekauoha,* 114
Fed. 849.

In order to determine the question raised by the demurrer it is only necessary to decide whether the publication complained of is libelous *per se.* If it is injury to the plaintiff will be presumed and special damages need not be alleged or proven, but general and punitive damages may be recovered. Whereas, if it is not libelous *per se,* the plaintiff must allege and prove special damages or his action will fail.

Plaintiff has alleged malice and it is his contention that special damages have been alleged but in this he is in error. The damages alleged are of a most general character. It is therefore necessary in order to sustain the pleading to hold that the publication is libelous *per se.*

Before entering upon an examination of the publication for the purpose of determining this question it will be well to get as clear an idea as possible of what the test is. Defendant cites and relies upon the case of *Nichols* v. *Daily Reporter Co.,* 30 Utah 74, 83 Pac. 573, where it is said that the correct test of a publication is "where the language used concerning a person or his affairs from its nature necessarily must, or presumably will, as its natural and proximate consequence occasion him pecuniary loss, its publication is libelous *per se.*"

Cooley in the third edition of his work on Torts at pages 376, 377, in giving a test for determining whether spoken words are slanderous so as to be actionable *per se* said:

"Certain publications are said to be actionable *per se.* By this is meant that an action will lie for making them without proof of actual injury, because their necessary or natural and proximate consequence would be to cause injury to the person of whom they are spoken, and therefore injury is to be presumed. In the case of certain other publications no such presumption can be made, because observation does not justify a like conclusion.

Therefore, in such cases, the publications are only action-able on averment and proof that injury which the law can notice actually followed as a natural and proximate consequence. \* \* \* In the recent case of *Pollard* v. *Lyon*, spoken words as a cause of action, are classified by Mr. Justice Clifford as follows: '1. Words falsely spoken of a person which impute to the party the com-mission of some criminal offense involving moral turpi-tude, for which the party, if the charge is true, may be indicted and punished. 2. Words falsely spoken of a person which impute that the party is infected with some contagious disease, where if the charge is true, it would exclude the party from society. 3. Defamatory words falsely spoken of a person, which impute to the party unfitness to perform the duties of an office or employment of profit, or the want of integrity in the discharge of the duties of such an office or employment. 4. Defamatory words falsely spoken of a party which prejudice such party in his or her profession or trade. 5. Defamatory words falsely spoken of a person which, though not in themselves actionable, occasion the party special damage.' The first four of these classes are of words actionable *per se*. The fifth embraces cases which are actionable only when the special damage is averred."

At pages 400-402 of the same work, where the test for determining whether a printed statement is libelous *per se* is given, it is said:

"In libel, as in slander, defamatory publications are classified as publications actionable *per se,* and publica-tions actionable on averment and proof of special damage. In the first class are embraced all cases of publications which would be actionable *per se* if made orally. These cases, therefore, require no further attention. It also embraces all other cases where the additional gravity imparted to the charge by the publication can fairly be supposed to make it damaging. Thus, to say of a man: 'I look upon him as a rascal,' is not slander, unless shown to be damaging; but if it be published of him in one of the public journals, the presumption that injury follows is reasonable and legitimate. So, to call a man in print

'an imp of the devil and cowardly snail,' is libelous, though an oral imputation of the sort would be presumably harmless. So, to charge a teacher with falsehood in a report made to the official board, and with general untruthfulness, is libelous *per se.* The general rule is stated thus: Any false and malicious writing published of another is libelous *per se,* when the tendency is to render him contemptible or ridiculous in public estimation, or expose him to public hatred or contempt, or hinder virtuous men from associating with him. 'The nature of the charge,' it is said in one case 'must be such the court can legally presume (the plaintiff) has been degraded in the estimation of his acquaintances, or of the public, or has suffered some other loss, either in his property, character, or business, or in his domestic or social relations in consequence of the publication.' Any words that tend to lower the plaintiff in the estimation of his friends or in the common estimation of citizens, or that tend to injure his social character or status, or to destroy the confidence of his neighbors in his integrity, are libelous *per se.*"

And again at pages 408-410 the author says:

"If the words alleged to have been used, whether written or spoken, are not actionable *per se,* or if they do not refer to the plaintiff, or if they are ambiguous, or if their defamatory meaning depends upon a local or provincial use of a word or words, or for any reason they require explanation by some extrinsic matter to make them actionable, such extrinsic facts must be alleged by way of inducement, both in order to show that the words are defamatory and to render the charge intelligible and certain. If the language is not actionable on its face and no extraneous facts are alleged, the action must fail. It is immaterial how the imputation is conveyed, whether by a direct charge, or by insinuation, or by means of some hidden or covert meaning in the words. Even the truth may be so stated as to imply a criminal charge and render the author liable. In one case it is said: 'In order to constitute a libel it is not necessary that the language should in express terms charge a crime. The charge may be made by insinuation. If the language of the publication be calculated to induce those who read it to

believe that the person of whom it is written is guilty of a crime, it is sufficient to support an action. The words of a publication might be literally true, yet if the sense of the publication is to impute a crime, it will be deemed libelous. Language is often more significant in suggestion than in expression. Truth half told is frequently more hurtful than blatant falsehood; it is not less venomous, and is more insidious. In determining whether the words charged are libelous *per se,* they are to be taken in their plain and natural import according to the ideas they are calculated to convey to those to whom they are addressed, reference being had not only to the words themselves, but also to the circumstances under which they were used. They should receive a fair and reasonable construction, and will be presumed to have been used in the ordinary import attached to them in the community in which they were uttered or published. 'In determining whether a given publication is libelous, the language thereof must be taken in its ordinary signification, and construed in the light of what might reasonably have been understood therefrom by the persons who read it. The question is, how would persons of ordinary intelligence understand the language.' In interpreting the language, it is not a question of the intent of the speaker or author, or even of the understanding of the plaintiff, but of the understanding of those to whom the words are addressed, and of the natural and probable effect of the words upon them. It is no defense that no harm was intended or that the words were used in jest. A person is presumed to intend the natural consequence of his acts and defamation consists solely in the effect produced upon the minds of third parties."

These extracts from Cooley constitute such a clear and comprehensive statement of the test to be applied to publications in general as to render it unnecessary for us to do more than deduce therefrom the test to be applied in such a case as this.

Libels affecting the character of private persons are classified according to their objects: (1) Libels which

impute to a person the commission of a crime.   (2) Libels which have a tendency to injure him in his office, profession, calling or trade.   (3) Libels which hold him up to scorn and ridicule and to feelings of contempt or execration, impair him in the enjoyment of society and injure those imperfect rights of friendly intercourse and mutual benevolence which man has with respect to man. Newell, Slander and Libel (3d ed.) p. 72.

It is clear that the libel in this case is of the third class and whatever may be the test of the other classes it is necessarily true that the test laid down in the Utah case, *supra,* in so far as it requires a "pecuniary" loss to be apparent is not the correct test of a libel of this class.

Again turning to Cooley we see that if the language used (when construed to mean what persons of ordinary intelligence reading it would reasonably understand it to mean) would tend to render him contemptible or ridiculous in public estimation or expose him to public hatred or contempt or hinder virtuous men from associating with him it is libelous *per se.*

What then is the tendency of the language used of and concerning the plaintiff in this case?

In his decision on the demurrer the circuit judge said:

"In his argument the defendant's attorney very ingeniously picked the alleged libel to pieces in an attempt to show that nothing was said which would hold the plaintiff up to scorn and ridicule.   But such is not the proper method of determining the character of a newspaper article.   An alleged libel must be considered as a whole. Its character can only be ascertained by recourse to the article as a whole, to the tone of the article as a whole and to the sense in which it was intended as gathered from the context and from all the facts and circumstances under which it was used.   Learned author above quoted has very tersely set forth the law on the subject.   'A word

at the end may alter the whole meaning. So if in one part appears something to the plaintiff's discredit, in another something to his credit, the 'bane' and the 'antidote' should be taken together. The law does not dwell on isolated passages, but judges of the publication as a whole.' "

This is undoubtedly the rule where the whole article relates to one subject for all that is said on the subject must be considered in order to determine the sense in which the article would naturally be understood by those reading it. But where one part of the article is upon a subject wholly foreign to the other we think that very little if any aid is to be had from an attempt to consider them together.

By way of illustrating what we have in mind we point out that the principal topic of discussion in the article is the failure of plaintiff to enter the fall swimming meet and comparing his sportsmanship with the sportsmanship of other local swimmers and the visiting swimmers. When all that is said on this subject is considered together we fail to find anything defamatory of plaintiff. The article itself shows, and we think the average reader would see, what conduct of plaintiff the writer had in mind as justifying his conclusion that plaintiff "quit cold;" that he "did not prove to be so much of a sport;" that he "has feet of clay," and "needs back bone," and that was his failure to enter the swimming meet after the visiting swimmers had been brought thousands of miles with the expectation of meeting him. We think that the average reader knows that there was no obligation, either moral or legal, resting upon plaintiff to enter even though he had received "world wide adulation, pages of publicity and many honors" as a swimmer and the average reader would therefore see from the article itself the ridiculousness of the writer's conclusion. Unquestionably plaintiff had the right to stay out of the

swimming whatever his excuse or even without excuse, and the publication is nothing more than a hostile comment upon the manner in which he exercised this right. To accuse one of being deficient in some quality which neither the law nor good morals requires of him as a good citizen is not libelous *per se*. *Urban* v. *Helmick*, 45 Pac. (Wash.) 747.

But there is another portion of this publication which we think has a decided tendency to subject the plaintiff to ridicule and contempt. We refer to the discussion under the head "A silly excuse offered." We think that the reader of ordinary intelligence reading this portion of the article would understand that some of the committee had stated to the writer or the writer had stated to the committee that the plaintiff has not a sufficient job, that is, a job by which he earns his living, or words to that effect, and that some of the committee said this was due to the fact that he is a Hawaiian, whereupon the writer protests in the name of the Hawaiian people, not against the statement that plaintiff has not a sufficient job, as counsel for defendant would have us believe, but against the reason assigned by some of the committee as to why he has not a sufficient job, by saying that the Hawaiian people will be the last to back up a loafer or a slacker. He does not make the charge in direct language that the plaintiff is without a sufficient job because he is a loafer or a slacker, but we submit that the language used is capable of no other meaning. The charge may be made by insinuations. Cooley on Torts 409. The publication therefore charges the plaintiff with being without a sufficient job and ascribes as a reason therefor that he is a loafer or a slacker. To thus charge him is to impute to him the characteristics of a loafer or a slacker. A loafer, as defined by Webster and as generally understood, is "One who loafs; a lazy lounger; one who has

the bad habits typical of street loafers." The term "slacker" is too new to be defined by any present authority but in American life it has a well established meaning known to every one of ordinary intelligence. The term came into use during the recent world war and was most generally applied to a person who unlawfully evaded, or attempted to evade, his military duty. The term, however, is sometimes used to convey another meaning very similar to the meaning of the term "loafer," especially when used in connection with other language which shows that the evasion of one's ordinary moral or civil duties, instead of military duty, was in mind.

We think, however, that in this enlightened age it is libelous *per se* to charge one with being a "loafer" for when we consider what the term implies we are impelled to the conclusion that such a charge tends to subject the person charged to social degredation and to the contempt of all right thinking people. It is therefore immaterial in which sense the term "slacker" was used or would be understood except that in the first sense more odium would be cast upon the person to whom it was applied. That changes in the social state may be considered in determining whether a certain charge is libelous *per se* was held, and we think correctly, in *Gomez* v. *Haw'n Gazette Co.*, 10 Haw. 108, 111.

The language last considered justified the circuit court in overruling the demurrer. The exception should therefore be, and is, overruled.

*C. S. Davis* (*Brown, Cristy & Davis* on the brief) for plaintiff.

*A. G. Smith* (*Peters & Smith* on the brief) for defendant.