KIT A. RUSSELL, Plaintiff-Appellant, *v.* AMERICAN
GUILD OF VARIETY ARTISTS, FRED O'BRIEN, and
BILL PACHECO, Defendants-Appellees

·No. 5081

May 15, 1972

RICHARDSON, C.J., MARUMOTO, ABE,
LEVINSON AND KOBAYASHI, JJ.

OPINION OF THE COURT BY KOBAYASHI, J.

Appellant, Kit Russell, brought suit in circuit court
against appellees, American Guild of Variety Artists
(A.G.V.A.) and A.G.V.A.'s Honolulu agent, Fred O'Brien,
for damages resulting from a defamatory letter written and
published by O'Brien while acting as an agent of A.G.V.A.
This appeal comes from the trial court's entry of judgment
for appellees.

Because the trial court's explicit findings of fact are par-
ticularly significant for purposes of this appeal, they are
here included in toto.

"1. Defendant O'Brien was the Honolulu branch

manager of Defendant AGVA.

"2. Plaintiff was a nightclub performer and a member of AGVA.

"3. Plaintiff had performed in various cities on the mainland United States and came to Honolulu under a several weeks' booking at the Oasis nightclub arranged through a Mr. Levy of San Francisco. Mr. Levy, although not Plaintiff's sole agent, is a booking agent and Plaintiff dealt with him in obtaining bookings.

"4. Plaintiff's booking at the Oasis nightclub was terminated at the end of 1966, and in response to an inquiry by Mr. Levy apparently seeking information as to Plaintiff's circumstance, Defendant O'Brien wrote a letter[1] dated February 14, 1967, to Mr. Levy in which the fact of termination of Plaintiff's employment at the Oasis was stated. Defendant O'Brien also wrote that Plaintiff 'is in the State Mental Hospital in Kaneohe. She was picked up by the police department for trespassing and was given a mental examination as ordered by the judge and has been committed to the hospital for a period of a year.' The part of the letter which was untrue was the part which said that Plaintiff was in and had been committed to the hospital. This erroneous statement was made by Defendant O'Brien without malice and as a result of conversations he had with court personnel in conjunction with Plaintiff's appearance in the district court on criminal charges. It was made in good faith by O'Brien who had an interest in the overall circumstances of Plaintiff

---

[1]"In reply to your letter of January 19, 1967 regarding Kit Russell, a hearing was held by the Hawaii Branch Executive Committee with Mr. Pacheco and Kit Russell both present. The dancer did violate her contract by not appearing on New Year's Eve—the biggest night of them all and she never informed the club she would not appear. The board voted in the night club's favor and denied Miss Russell's claim.

"In the meantime, Miss Russell is in the State Mental Hospital in Kaneohe. She was picked up by the police department for trespassing and was given a mental examination as ordered by the judge and has been committed to the hospital for a period of a year.

"This is all the information we have and hope this information will help straighten out your records."

who was a member of AGVA, to an inquiry on the part of Mr. Levy who, as a booking agent with whom Plaintiff dealt, had an interest in Plaintiff's circumstance."

In holding for appellees, the trial court concluded that O'Brien had a qualified privilege to publish the erroneous communication and that such communication having been made in good faith and without malice, it was not actionable.

Appellant brings to issue whether the erroneous letter written by O'Brien constituted defamation *per se,* whether a qualified privilege existed under the facts shown, and whether, assuming the existence of such qualified privilege, it was abused and therefore lost.

#### DEFAMATION *PER SE*

This court, in *Kahanamoku v. Advertiser Publishing Co.,* 25 Haw. 701, 709 (1920), recognized that if the publication in question is libelous *per se,* the "injury to the plaintiff will be presumed and special damages need not be alleged, or proven, but general and punitive damages may be recovered. Whereas, if it is not libelous *per se,* the plaintiff must allege and prove special damages or his action will fail." After citing at length authority on the test to be utilized in determining what constitutes libel *per se,* the court in *Kahanamoku* classified libels that affect the character of private persons according to their objects as "(1) Libels which impute to a person the commission of a crime. (2) Libels which have a tendency to injure him in his office, profession, calling or trade. (3) Libels which hold him up to scorn and ridicule and to feelings of contempt or execration, impair him in the enjoyment of society and injure those imperfect rights of friendly intercourse and mutual benevolence which man has with respect to man." *Kahanamoku, supra* at 712-13. The court then went on to hold that the defamation in question was libelous *per se* because it tended "to subject the person charged to social degredation [*sic*] and to the contempt of all right thinking peoplc." *Kahanamoku, supra* at 716.

This court has also held as libelous *per se* words which impute to one unfitness to perform the duties of his employ-

ment or which have a tendency to prejudice him in such employment. *Rice v. Honolulu Star-Bulletin, Ltd.*, 26 Haw. 196, 206 (1921). Although not considered previously in this jurisdiction, it was generally been held that imputation of insanity or impairment of mental faculties is libelous *per se*. *E.g.*, *Cowper v. Vannier*, 20 Ill. App. 2d 499, 156 N.E.2d 761 (1959); *Brauer v. Globe Newspaper Co.*, 351 Mass. 53, 217 N.E.2d 736 (1966); *Kenny v. Hatfield*, 351 Mich. 498, 88 N.W.2d 535 (1958).

In accordance with the above authority, we find merit in appellant's contention that the letter written by O'Brien constituted libel *per se*. Certainly a statement that one has been committed to a state mental hospital would, among other things, have a tendency to prejudice him in such employment. This would clearly be true in a case such as the one before us where the defamatory letter specifically concerned the employment of the person defamed.

A finding that the publication is libelous *per se* presumes damages to the injured party and thus special damages need not be shown.[2] This is not, however, determinative of the issue whether defendant is liable. The claim for relief remains subject to a privilege defense asserted by the publisher of the defamatory material.

### QUALIFIED PRIVILEGE

The distinction between an absolute privilege and a conditional or qualified privilege concerning the defamation of a private person, and the basis for the privilege itself is aptly

---

[2]There exists in many jurisdictions some confusion as to general distinctions between libel, libel *per se* and slander *per se*. The English rule is and the early American rule was that any libel, as distinguished from most slander, is actionable without proof of damage. *E.g.*, RESTATEMENT OF TORTS § 569 at 165 (1938), "One who falsely, and without a privilege to do so, publishes matter defamatory to another in such a manner as to make the publication a libel is liable to the other although no special harm or loss of reputation results therefrom." A minority of American jurisdictions still adhere to this position. PROSSER, LIBEL PER QUOD, 46 Va. L. Rev. 839, 847 (1960). The majority of courts, however, have held that where the written publication is not defamatory on its face (libel per quod) or where it does not fall within one of the slander *per se* categories (imputation of crime, loathsome disease, defamation affecting business, or unchastity on the part of a woman) it is not actionable without a show-

▮▮▮▮▮▮▮

set forth in PROSSER, THE LAW OF TORTS, 776-77 (4th ed. 1971):

[C]onduct which otherwise would be actionable is to escape liability because the defendant is acting in furtherance of some interest of social importance, which is entitled to protection even at the expense of uncompensated harm to the plaintiff's reputation. The interest thus favored may be one of the defendant himself, of a third person, or of the general public. If it is one of paramount importance, considerations of policy may require that the defendant's immunity for false statements be absolute, without regard to his purpose or motive, or the reasonableness of his conduct. If it has relatively less weight from a social point of view, the immunity may be qualified, and conditioned upon good motives and reasonable behavior. The defendant's belief in the truth of what he says, the purpose for which he says it, and the manner of publication, all of which are immaterial when no question of privilege is involved, may determine the issue when he enters the defense of such a conditional privilege.

In *Aku v. Lewis*, 52 Haw. 366, 371, 477 P.2d 162, 166 (1970), we set forth the appropriate test for determining under what circumstances a qualified privilege is to be considered applicable.

A qualifiedly privileged occasion arises when the author of the defamatory statement reasonably acts in the discharge of some public or private duty, legal, moral, or social, and where the publication concerns subject matter in which the author has an interest and the recipients of the publication a corresponding interest or duty. *White v. Nicholls*, 44 U.S. (3 How.) 266, 290 (1845); *Harrison v. Bush*, 119 Eng. Rep. 509, 512 (1855); *Toogood v. Spyring*, 149 Eng. Rep. 1044, 1049 (1834).

The interest or duty of the recipients is essential to

---

ing of special damages. PROSSER, THE LAW OF TORTS, 763 (4th ed. 1971). For a general discussion of the origin of the confusion concerning the divergent meanings of defamation *"per se"* see Note, LIBEL PER SE AND SPECIAL DAMAGES, 13 Vand. L. Rev. 730 (1960).

the privilege. If the person or persons to whom the communication is addressed have no recognized interest in the statement, there is no privilege. *Pecue v. Collins,* 204 App. Div. 142, 144, 197 N.Y.S. 835, 837 (1923); *cf. Lathrop v. Sundberg,* 55 Wash. 144, 148, 104 P. 176, 177 (1909).

The above test places emphasis on the reasonable action of the author of the publication and the corresponding interest between the author and the recipient.[3] O'Brien must have satisfied both of these requirements for us to sustain the finding that a qualified privilege defense was available to appellees.

Appellant contends that at the time the defamatory letter was published, there existed no relationship between Levy and appellant. It is appellant's position that any agency relationship that previously existed was terminated when appellant signed her contract with the Oasis Club in Honolulu. Apparently if appellant were aware of our decision in *Aku v. Lewis, supra,* it would be her contention that at the time the defamation was published, Levy had no interest in the subject matter of the letter. As such, appellant would doubtlessly assert that a qualified privilege was not applicable to O'Brien's publication.

We cannot agree. We are not here presented with the issue whether Levy, as a theatrical booking agent who lined up the Oasis job for appellant, lost his interest in appellant under the qualified privilege test when appellant signed the contract for that job. The facts as borne out from the testimony given at trial indicate that both O'Brien and Levy had a common, corresponding interest in appellant's working

---

[3]Among the areas where such a common interest has been recognized is the credit agency area which presents situations not unlike the one before us today. It is felt that credit agencies perform a useful business service for the benefit of those who have a legitimate interest in obtaining credit information. Where honest inquiries are made to the agencies and the information is furnished in a reasonable manner and in good faith, such agencies are held to have a qualified privilege. Altoona Clay Products, Inc. v. Dun & Bradstreet, Inc., 286 F. Supp. 899 (W.D. Pa. 1968), *vacated on other grounds* 308 F. Supp. 1068; Petition of Retailers Commercial Agency, Inc., 342 Mass. 515, 174 N.E.2d 376 (1961); Retail Credit Co. v. Garraway, 240 Miss. 230, 126 So.2d 271 (1961).

status at the time of the publication.

Apparently appellant lost her job at the Oasis because she failed to show up one night for work. Her contention is that she was sick and therefore her employment was wrongfully terminated. After her dismissal she filed a complaint with O'Brien, her A.G.V.A. union representative. The following portion of appellant's testimony at trial concerning her communications with Levy subsequent to her dismissal is significant.

"Q   [D]id you hear from Mr. Levy in California, for instance?

"A   I had called Los Angeles to inform them of what had happened. And being that I didn't have enough money to continue my conversation, I just told them to write me or let me know or try to find me another position.

"Q   And what was the response to this?

"A   I never heard again from them until later in January.

"Q   What did you hear then?

"A   He asked—Mr. Levy wrote to me and asked me what was this, that he had received a letter from Fred O'Brien stating that I was in a mental institution in Kaneohe committed for a period of one year and what to do with my belongings."

Appellant indicates in the above passage that after she was dismissed from her employment at the Oasis she communicated with Levy's agency asking them to find her another booking. In light of such testimony we are unable to understand how appellant can in good faith argue that Levy did not acquire a direct interest in appellant's working status at that point. Such a conclusion seems inevitable even if the argument—that Levy acquired a disinterested status under the qualified privilege test when appellant signed the Oasis contract—were considered valid. As such, the trial court's finding that a common interest in the work status of appellant existed at the time of the publication between O'Brien, appellant's A.G.V.A. representative, and Levy, her booking agent, must be sustained. The question remains whether O'Brien acted reasonably in communicating with

Levy, or whether he abused any privilege he may have held.

## ABUSE OF PRIVILEGE

The trial court found that the communication from O'Brien to Levy, although erroneous in part, was made in good faith and without malice.[4] We must go to the record to determine if there exists substantial evidence to sustain this finding.

As stated in the findings of fact of the trial court, O'Brien wrote to Levy in response to an inquiry made by Levy, apparently seeking information as to appellant's work status. This point is not entirely clear because Levy did not appear at trial nor was his deposition taken. O'Brien's letter to Levy does, however, support such a conclusion. The first line itself reads "In reply to your letter of January 19, 1967 regarding Kit Russell, . . . ." We do not feel that the existence of an inquiry or request for information should alone be considered determinative of the qualified privilege issue where the response contains defamatory material, but the fact that the publication was solicited must be considered relevant to the reasonableness issue.[5]

---

[4]The word malice as used in the context of an abuse of a qualified privilege is not given the same meaning as that attributed to it in the constitutional privilege area. In New York Times Co. v. Sullivan, 376 U.S. 254, 279-80, it was held that " 'actual malice' [constituted] knowledge that it was false or with reckless disregard of whether it was false or not. . . ." We recognized this "actual malice" standard in the case of Tagawa v. Maui Publishing Co., Ltd., 50 Haw. 648, 652, 448 P.2d 337, 340 (1968). Recently the U. S. Supreme Court extended the constitutional first amendment privilege, which previously had encompassed cases invloving "public officials" and "public figures", to include cases involving private individuals involved in "matters of public or general concern". Rosenbloom v. Metromedia, Inc., 403 U.S. 29 (1971). The instant case does not fall within the above categories but, as explained *supra*, is a qualified privilege case. As such, the qualified privilege "must be exercised in a reasonable manner and for a proper purpose." PROS-SER, THE LAW OF TORTS. 792 (4th ed. 1971). Addressing himself directly to the use of the word malice in this area, Prosser says that "[d]iscarding 'malice' as a meaningless and quite unsatisfactory term, it appears that the privilege is lost if the publication is not made primarily for the purpose of furthering the interest which is entitled to protection. . . . . Probably the best statement of the rule is that the defendant is required to act as a reasonable man under the circumstances, with due regard to the strength of his belief, the grounds that he has to support it, and the importance of conveying the information". *Id*. at 795-96.

[5]*See* RESTATEMENT OF TORTS, § 595, comment *i* at 253 (1938).

Appellant's request to Levy that another job be located for her apparently precipitated Levy's inquiry to O'Brien. The justification for O'Brien's response must be found in O'Brien's deposition as he was not present at trial:

"Q  Continuing in your letter, you stated, 'In the meantime, Miss Russell is in the State Mental Hospital in Kaneohe'.

"A  Yes.

"Q  Where did you receive that information?

"A  I can give you the whole story, if you want me, to.

"Q  I would like to hear it.

"A  Well, Lavon, or Miss Russell, after this mixup with the Club, a little while later I got a call from Mr. Watanuki of the District Court, saying that she had been picked up and they were holding here for mental examination. So, I ask was there anything that we could do for her, and he asked me if she was connected with AGVA, and I said, 'Yes, she is a member, and if there is anything that I can do I would be glad to help the girl, that is our job.' He said, 'No, right now we cannot do anything because she is being held for mental observation. I will let you know if anything else comes up.' I said that I would appreciate it. So I waited and waited and I didn't hear from him, so finally I thought, well, I better call up and see how the kid is doing. And I called up, and he was out and a lady answered the phone, so I asked her about the case and she checked it up I guess or left the phone for a while and came back and said, 'Oh, she has been put away.' So, I said, 'Anything I can do?' She said, 'No, I will have Mr. Watanuki call you when he comes back.' I said that I would appreciate that. I wanted to help her, this is a terrible thing, and I intended to write her agent about it, but he wrote me asking me, how is she, where is she, what is she doing, and wanted to know if there was some way he could help the kid. I had nothing against her, and I don't think she had anything against me, so why would I want to hurt her.

That is the last thing I would want to do.

. . . .

"Q Continuing with your letter, you said, 'She was picked up by the Police Department for trespassing and was given a mental examination, as ordered by the Judge, and committed to the hospital for a period of a year.' From whom did you receive that information?

"A When I talked to Mr. Watanuki, I said to him, 'What do you mean, you will have to hold her for mental observation, what does that mean.' He said, 'We are liable to confine here for a while.' I said, 'How long would that be.' And he said, 'Probably a year or so, I don't know.' When I did call up next and they said that she was put away I naturally misunderstood, really."

Based on the evidence presented, it would not have been unreasonable for the trial court as the trier of fact to have concluded that: Appellant upon being dismissed from the Oasis contacted O'Brien to register a complaint with the A.G.V.A. and Levy's agency to find her another job. Then Levy made an inquiry to O'Brien as to why she was dismissed and as to what her status was. O'Brien, after having discussed appellant's status with court personnel and reasonably believing that she had been committed, then responded to Levy's inquiry with the letter containing the erroneous statement.

We recognize that the trial court found O'Brien's deposition testimony to be credible. As such we would be remiss to find that the record is without substantial evidence to support the factual findings of the trial court. *See Ashford v. Thos. Cook & Son, Ltd.*, 52 Haw. 113, 123, 471 P.2d 530, 536 (1970). A qualified privilege was properly held applicable to O'Brien and there being substantial evidence to show that the privilege was not abused, the decision of the trial court must be affirmed.

*John H. Robinson* for plaintiff-appellant.
*Raymond Lee* for defendant-appellee.