944 P.2d 1265

**In the Matter of the Application of Mark L. PETERSON, Complainant–Appellant,**

v.

**HAWAII ELECTRIC LIGHT COMPANY, INC., a Hawai'i corporation, Respondent–Appellee**

No. 18024.

Supreme Court of Hawai'i.

Sept. 5, 1997.

William J. Rosdil and Paul K. Hamano (of William J. Rosdil, a law corporation), on the briefs, Hilo, for complainant-appellant Mark L. Peterson.

Margaret Jenkins Leong and Thomas W. Williams (of Goodsill Anderson Quinn & Stifel), on the briefs, Honolulu, for respondent-appellee Hawai'i Electric Light Company, Inc.

Before MOON, C.J., KLEIN, LEVINSON, RAMIL, JJ., and Circuit Court Judge SHIMABUKURO, in place of NAKAYAMA, J., Recused.

LEVINSON, Justice.

The complainant-appellant Mark L. Peterson appeals the Public Utilities Commission's (PUC) Decision and Order (D & O) No. 13198, filed on April 4, 1994, dismissing his complaint against the Hawai'i Electric Light Company (HELCO) based upon the PUC's determination that HELCO's Pohoiki Transmission Line No. 2 (PTL No. 2) was in substantial compliance with PUC's D & O No. 10620. On appeal, we are asked to review the PUC's finding that the PTL No. 2 was in substantial compliance with D & O No. 10620. We need not address this issue because we hold that this court lacks appellate jurisdiction to hear a direct appeal from a PUC order dismissing a complaint that merely alleges error in the placement of transmission lines. Accordingly, we dismiss this appeal for lack of appellate jurisdiction.

## I. BACKGROUND

This appeal arises from HELCO's construction of two overhead, sixty-nine kilovolt (kv) transmission lines that interconnect Puna Geothermal Venture's (PGV) geothermal facility at Pohoiki, on the Island of Hawai'i, with HELCO's electric system located near its Puna substation. These lines transmit power generated by PGV's geothermal facility so that the power can be distributed to HELCO's customers.

In preparation for the construction of the transmission lines, a routing study and an environmental impact statement (EIS) were prepared. The routing study was prepared on HELCO's behalf by DHM, Inc. (DHM), an engineering consulting firm; in the routing study, DHM located optimum "transmission corridors" based on "opportunities and constraints" pertaining to placement of the lines, such as land use, special conservation restrictions, geographic features, and existing transportation and utility infrastructures. The routing study then located two proposed route alignments within the transmission corridors through further study of environmental, geographic, and economic factors; the placement of one of these route alignments is at the heart of the present dispute.

Portions of the proposed alignments passed through state conservation district and state-owned agricultural land. Because the project proposed the possible use of state lands in those areas, an environmental assessment by the Department of Land and Natural Resources (DLNR) was required pursuant to Hawai'i Revised Statutes (HRS) ch. 343. As part of its assessment, the DLNR determined that an EIS was required. Accordingly, DHM prepared and submitted an EIS on HELCO's behalf. Thereafter, the DLNR approved the routing of the lines, portions of which passed through the Nānāwale Forest Reserve.

On September 6, 1989, both the routing study and the EIS were submitted in support of HELCO's application to the PUC for approval of the placement of the transmission lines. Approval by the PUC is required pursuant to (1) HRS § 269–27.5 (1993), which requires PUC approval for the construction of new overhead transmission lines in excess of forty-six kv through residential areas, and (2) PUC General Order No. 7, which requires PUC approval for any expenditure by a utility exceeding $500,000. After the requisite public hearing, the PUC issued D & O No. 10620 on May 8, 1990, approving HELCO's request to construct the transmission lines. In particular, D & O No. 10620 ruled that

[t]he Commission finds that the construction of the proposed transmissions lines is necessary, if HELCO is to be assured of

firm capacity from PGV. The capacity to be furnished by PGV is required to improve HELCO's service reliability in the Puna area. The Commission further finds that the construction of the overhead lines is reasonable, will be safe and prudent, and is in the public interest.

Furthermore, D & O No. 10620 contained a general description of the placement of the proposed transmission lines. Specifically, PTL No. 2 was characterized in D & O No. 10620 as being

> 18.2 miles long. It will originate on the northern edge of the geothermal site, cross Kapoho Road, and head northwest across open vacant land to the edge of Nanawale Farm ranch lands. It will then continue along the outside edge of the ranch lands and Nanawale Estates subdivision to the northeast corner of Nanawale Estates subdivision.

Peterson purchased certain real property in September 1990, several months after the PUC authorized the placement of HELCO's transmission lines. As constructed, PTL No. 2 skirted Peterson's property, at its closest point, by approximately 150 feet. The sellers of Peterson's property had not informed him of then-ongoing negotiations, in which HELCO was involved, to acquire an easement over the property, or of any imminent threat of condemnation. Apparently, it was only in November 1992 that it became evident to Peterson that HELCO had entered into an agreement with a neighboring landowner to locate the transmission line on the parcel adjacent to Peterson's property. Thus, as constructed, PTL No. 2 did not follow the precise route described in D & O No. 10620. However, except for those portions near Peterson's property and the Puna substation, PTL No. 2 followed the general route described in D & O No. 10620.

On December 8, 1992, Peterson filed a formal complaint with the PUC alleging that HELCO had violated D & O No. 10620 when it failed to construct PTL No. 2 in exact conformity therewith. On April 6, 1994, after an extensive hearing, the PUC issued D & O No. 13198, dismissing his complaint. In its order, the PUC concluded that the description of PTL No. 2 contained in D & O No. 10620 was not meant to dictate final placement of the line, but, rather, was a "proposed" alignment. Furthermore, the PUC determined that the deviations from D & O No. 10620 were not substantial and were only a result of negotiations with the landowner over whose property the line was intended to pass. Thus, because the final alignment of PTL No. 2 was understood to be subject to negotiations for rights-of-way with affected landowners, the PUC concluded that HELCO was not required to obtain additional PUC approval for the final alignment of PTL No. 2. Therefore, inasmuch as the final alignment of PTL No. 2 substantially followed the general route described in D & O No. 10620, Peterson's complaint was dismissed.

Peterson filed his notice of appeal from D & O No. 13198 on May 4, 1994.

## II. *DISCUSSION*

### A. *Principles Of Appellate Jurisdiction*

Peterson primarily relies upon HRS § 269–16 as the jurisdictional basis for his appeal of D & O No. 13198. HRS § 269–16 (1993) provides in relevant part:

> **Regulation of utility rates; ratemaking procedures.** (a) All rates, fares, charges, classifications, schedules, rules, and practices made, charged, or observed by any public utility . . ., shall be just and reasonable and shall be filed with the public utilities commission. . . .
>
> To the extent that the contested case proceedings referred to in chapter 91[1] are required in any rate proceeding . . . such evidentiary hearings shall be conducted expeditiously and shall be conducted as a part of the ratemaking proceeding.
>
> (b) No rate, fare, charge, classification, schedule, rule, or practice . . . shall be established, abandoned, modified, or departed from by any public utility, except [after notice] and prior approval by the commission for any increases in rates,

---

1. HRS ch. 91, the Hawai'i "Administrative Procedure" Act (HAPA), outlines, *inter alia*, the procedures to which an administrative agency must adhere.

fares or charges.... A contested case hearing shall be held in connection with any increase in rates....

(c) The commission may in its discretion and after public hearing ... authorize temporary increases in rates, fares, and charges....

(d) The commission shall make every effort to complete its deliberations and issue its decision as expeditiously as possible....

(e) ... [T]he commission may distribute, apportion, or allocate gross income, deductions, credits or allowances between or among [two or more] organizations, trades or businesses....

(f) *From every order made by the commission under this chapter that is final or, if preliminary, is of the nature defined by section 91–14(a),*[2] *an appeal shall lie to the supreme court subject to chapter 602*[3] *only by a person aggrieved in the contested case hearing provided for under this section* in the manner and within the time provided by chapter 602, and by the rules of court. The commission may elect to be a party to all matters from which an order of the commission is appealed, and the commission may file appropriate responsive briefs or pleadings in the appeal; provided that where there was no adverse party in the case below or in cases where there is no adverse party to the appeal, the commission shall be a party to all matters in which an order of the commission is appealed and shall file the appropriate responsive briefs or pleadings in defending all such orders. The appearance of the commission as a party in appellate proceedings in no way limits the participation of persons otherwise qualified to be parties on appeal. The appeal shall not of itself stay the operation of the order appealed from, but the court may stay the order after a hearing upon a motion therefor and

may impose conditions it deems proper as to giving a bond and keeping the necessary accounts or otherwise in order to secure a restitution of the excess charges, if any, made during the pendency of the appeal in case the order appealed from should be sustained, reversed, or modified in whole or in part.

(g) For public utilities having annual gross revenues of less than $2,000,000, the commission may make and amend its rules and procedures which will provide the commission with sufficient facts necessary to determine the reasonableness of the proposed rates without unduly burdening the utility company and its customers.

(Emphasis added.)

▬▬▬ In its answering brief, HELCO does not argue that this court lacks jurisdiction to hear Peterson's appeal. Nevertheless,

> jurisdiction is the base requirement for any court considering and resolving an appeal or original action. Appellate courts, upon determining that they lack jurisdiction shall not require anything other than a dismissal of the appeal or action. Without jurisdiction, a court is not in a position to consider the case further. Thus, appellate courts have an obligation to insure that they have jurisdiction to hear and determine each case. The lack of subject matter jurisdiction can never be waived by any party at any time. Accordingly, when we perceive a jurisdictional defect in an appeal, we must, *sua sponte*, dismiss that appeal.

*Housing Fin. and Dev. Corp. v. Castle*, 79 Hawai'i 64, 76, 898 P.2d 576, 588 (1995) (citations, internal quotation signals, brackets, and ellipsis points omitted).

Because we perceive a jurisdictional defect, we address the issue *sua sponte* and dismiss this appeal.

---

**2.** HRS § 91–14 (1993) provides in relevant part:

**Judicial review of contested cases.** (a) Any person aggrieved by a final decision and order in a contested case or by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief is entitled to review....

(b) ... [P]roceedings for review shall be instituted in the circuit court ... except where a statute provides for a direct appeal to the supreme court....

**3.** HRS ch. 602, entitled "Courts of Appeal," outlines, *inter alia*, the jurisdiction and powers of this court.

B. *This Court Lacks Jurisdiction Under HRS Ch. 269 To Hear A Direct Appeal From An Order Of The PUC Dismissing A Complaint Against A Public Utility In A "Non–Ratemaking" Case.*

We begin our analysis with the observation that judicial review of decisions of administrative agencies is governed by HAPA—in particular, HRS § 91–14—, which authorizes judicial review of the final decisions and orders of administrative agencies in contested cases. *See supra* note 2. However, "[p]roceedings for review shall be instituted in the circuit court ... except where a statute provides for a direct appeal to the supreme court[.]" *See* HRS § 91–14(b), *supra* at note 2.

Matters relating to the PUC are governed by HRS ch. 269. The chapter contains a direct appeal provision in HRS § 269–16(f) [4] —the subsection that outlines the PUC's authority to regulate utility *rates*. *See* section II.A of this opinion, *supra*. The presence or absence of subject matter jurisdiction over this appeal revolves around the resolution of what appears to be conflicting language in HRS § 269–16(f). On the one hand, the statute generally authorizes an appeal "[f]rom every order made by the commission *under this chapter*" (emphasis added), *i.e.,* under HRS ch. 269, which outlines, *inter alia*, the general powers, duties, and investigative powers of the PUC. On the other hand, the statute simultaneously and specifically provides that "an appeal shall lie" *to this court* "only by a person aggrieved in a contested case hearing provided for *under this section*" (emphasis added), *i.e.*, under the section whose subject matter is restricted to "regulation of utility rates" and "ratemaking procedures." In order to harmonize what appears to be conflicting language in HRS § 269–16(f), we turn to certain applicable canons of statutory construction as well as relevant legislative history for guidance.

1. *Principles of statutory construction*

■■■■ Our analysis of HRS § 269–16(f) is guided by several basic principles of statutory construction. First, "[t]he fundamental starting point for statutory interpretation is the language of the statute itself." *Mathewson v. Aloha Airlines, Inc.*, 82 Hawai'i 57, 71, 919 P.2d 969, 983 (1996) (citation and internal quotation signals omitted); *State v. Kwak*, 80 Hawai'i 291, 295, 909 P.2d 1106, 1110 [*Kwak I* ] (citation and internal quotation signals omitted), *vacated in part on other grounds on reconsideration*, 80 Hawai'i 297, 909 P.2d 1112 (1995) [*Kwak II* ]. Second, "where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning." *Kwak I*, 80 Hawai'i at 295, 909 P.2d at 1110 (citation and internal

---

4. HRS ch. 269 also provides for a direct appeal to this court under HRS § 269–15 (1993). Section 269–15 provides in relevant part:

**Commission may institute proceedings to enforce chapter.** (a) If *the public utilities commission* is of the opinion that any public utility or any person is violating or neglecting to comply with any provision of this chapter ..., it shall in writing inform the public utility or the person and *may institute such proceedings before it as may be necessary to require the public utility or the person to correct any* such deficiency. ...

(b) In addition to any other remedy available, the commission or its enforcement officer may issue citations to any person acting in the capacity of or engaging in the business of a public utility within the State, without having a certificate of public convenience and necessity or other authority previously obtained under and in compliance with this chapter or the rules promulgated thereunder.

. . . .

(4) *If any party is aggrieved by the decision of the commission* or the designated hearings officer, *the party may appeal to the supreme court* provided that the operation of an abatement order will not be stayed on appeal. ...
(Emphases added.) Because this appeal clearly does not stem from an act on the part of the PUC *initiating* a proceeding *against* a public utility or a person found by the PUC to be in violation of any provision of HRS ch. 269, the mode of direct appeal prescribed in HRS § 269–15 is clearly inapplicable to Peterson.

Direct appeals from PUC orders are also prescribed under HRS ch. 271, the Motor Carrier Law, and HRS ch. 271G, the Hawai'i Water Carrier Act. The PUC is the administering agency with respect to both chapters. *See* HRS §§ 271–2 and 271G–3. Under HRS ch. 271, a direct appeal is authorized by HRS §§ 271–32(e) and 271–33. Under HRS ch. 271G, a direct appeal is authorized by HRS § 271G–24. But because this appeal does not implicate the PUC's authority under either the Motor Carrier Law or the Hawai'i Water Carrier Act, this mode of direct appeal is also inapplicable to Peterson.

quotation signals omitted). Third, implicit in the task of statutory construction is "our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." *Mathewson*, 82 Hawai'i at 71, 919 P.2d at 983 (citation and internal quotation signals omitted); *Kwak I*, 80 Hawai'i at 295, 909 P.2d at 1110 (citations and internal quotation signals omitted). Fourth, "[w]hen there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists." *Ko'olau Agric. Co. v. Commission on Water Resource Management*, 83 Hawai'i 484, 488–89, 927 P.2d 1367, 1371–72 (1996) (citations, internal quotation signals, and brackets omitted). And fifth,

> [i]n construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning. Moreover, the courts may resort to extrinsic aids in determining the legislative intent. One avenue is the use of legislative history as an interpretive tool.

*Gray v. Administrative Dir. of the Court*, 84 Hawai'i 138, 148, 931 P.2d 580, 590 (1997) (citations, internal quotation signals, and brackets omitted).

■ As indicated above, because the language of HRS § 269–16(f) appears to provide, on the one hand, for a direct appeal "from every order made by the commission *under this chapter*" (emphasis added), and, on the other hand, "only by a person aggrieved in the contested case hearing provided for *under this section*" (emphasis added), it is apparent that the language of the statute is not free of ambiguity. Thus, applying the aforementioned principles of statutory construction, "the meaning of the ambiguous words may be sought by examining the context" of the ambiguous statute, which we do in applying two long-held maxims of statutory construction in an attempt to harmonize the wording of HRS § 269–16(f); we then "resort to extrinsic aids in determining the legislative intent," which we do by turning to "legislative history as an interpretive tool" in order to harmonize the wording of the statute with the purposes and policies underlying HRS § 269–16(f).

a. *application of canons of statutory construction to harmonize the wording of HRS § 269–16(f)*

■ First, the canon of construction denominated *noscitur a sociis* provides that the meaning of words may be determined by reference to their relationship with other associated words and phrases. *State v. Merino*, 81 Hawai'i 198, 217, 915 P.2d 672, 691 (1996). Thus, when two or more words are grouped together, *noscitur a sociis* "requires that the more general and the more specific words of a statute must be considered together in determining the meaning of a statute, and that the general words are restricted to a meaning that should not be inconsistent with, or alien to, the narrower meanings of the more specific words of the statute." *In re Pacific Marine & Supply Co. Ltd.*, 55 Haw. 572, 578 n. 5, 524 P.2d 890, 894 n. 5 (1974); *see also* HRS § 1–15(1) (1993); N. Singer 2A *Sutherland Statutory Construction* § 47.16 (5th ed. 1992) [hereinafter, *Sutherland Statutory Construction*]. Accordingly, that portion of § 269–16(f) that appears to authorize direct appeals of *any* final order "made by" the PUC under HRS ch. 269 should be restricted by the more specific words of the statute, which authorize a direct appeal to this court—thereby bypassing the usual intervening review by the circuit court pursuant to HRS § 91–14(b), *see supra* note 2—only by a person aggrieved in a contested case hearing specifically conducted pursuant to HRS § 269–16.

■ A variation of *noscitur a sociis* is the maxim of *ejusdem generis*. Where general words follow specific words in a statute, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words. *Richardson v. City and County of Honolulu*, 76 Hawai'i 46, 74, 868 P.2d 1193, 1201, *reconsideration denied*, 76 Hawai'i 247, 871 P.2d 795 (1994). "Where the opposite sequence is found, i.e., specific words following general ones, the doctrine is equally applicable, and restricts application of the general term to

things that are similar to those enumerated." *Sutherland Statutory Construction* § 47.17. As that treatise explains,

> [t]he doctrine of *ejusdem generis* is an attempt to reconcile an incompatibility between specific and general words so that all words in a statute can be given effect, all parts of a statute can be construed together and no words will be superfluous. If the general words are given their full and natural meaning, they would include the objects designated by the specific words, making the latter superfluous.

*Id.* Accordingly, the general phrase "[f]rom every order made by the commission under this chapter" precedes the more specific phrase limiting a direct appeal to this court to one taken "only by a person aggrieved in the contested case hearing provided for under this section," the scope of which, by the express terms of HRS § 269–16(a), is limited to "[a]ll rates, fares, charges, classifications, schedules, rules, and practices made, charged, or observed by any public utility." Applying the doctrine of *ejusdem generis,* the general language of HRS § 269–16(f) authorizing direct appeals to this court from any final order entered under HRS ch. 269 is therefore restricted by the specific language limiting such direct appeals to final orders entered in "ratemaking" cases under HRS § 269–16.

### b. *legislative history*

Our interpretation of what may be directly appealed to this court under HRS § 269–16(f) is also guided by legislative history. HRS § 269–16 is the successor to Revised Laws of Hawai'i (RLH) § 2234 (1915), which provided:

> **Regulate rates, etc.; appeals.** All rates, fares, charges, classifications, rules and practices made, charged, or observed by any public utility, or by two or more public utilities, jointly, shall be just and

reasonable, and the commission shall have the power, after a hearing upon its own motion, or upon complaint, and in so far as it is not prevented by the constitution or laws of the United States, by order to regulate, fix and change all such rates, fares, charges, classifications, rules and practices, so that the same shall be just and reasonable, and to prohibit rebates and unreasonable discriminations between localities, or between users or consumers under substantially similar conditions. *From every order made by the commission under the provisions of this section an appeal shall lie to the supreme court of Hawaii* in like manner as an appeal lies from an order or decision of a circuit judge at chambers. Such appeal shall not of itself stay the operation of the order appealed from, but the supreme court may stay the same, after a hearing upon a motion therefore, upon such conditions as it may deem proper as to giving a bond and keeping the necessary accounts or otherwise in order to secure a restitution of the excess charges, if any, made during the pendency of the appeal in case the order appealed from should be sustained in whole or in part.

(Emphasis added.)

In 1920, this court held that RLH § 2234 (1915) authorized direct appeals only from those PUC orders that regulated, fixed, or changed rates, fares, charges, classifications, rules, or practices. *City and County of Honolulu v. Honolulu Rapid Transit & Land Co.,* 25 Haw. 332, 334 (1920). Accordingly, we dismissed the direct appeal of a PUC order requiring the transit company to remove certain street railway tracks, holding that the non-ratemaking order at issue was not *directly* appealable to this court under RLH § 2234, but was *secondarily* appealable only after an initial appeal to the circuit court.[5]

---

5. The dissent's attempt to minimize the relevance of *Honolulu Rapid Transit & Land Co.* is unpersuasive. Indeed, the dissent itself highlights, at 3, the fact that an order of the PUC requiring the transit company to remove certain street railway tracks did *not* constitute an attempt, pursuant to RLH § 2234—the predecessor to HRS § 269–16—, "to regulate rates, fares, charges, classifica-

tions, rules and *practices* charged or observed by the public utility" and that, for that reason alone, "no appeal l[ay] to the supreme court in the first instance." *Honolulu Rapid Transit & Land Co.,* 25 Haw. at 334 (emphasis added). Accordingly, this court's ultimate conclusion in that case, as it is in the matter presently before us, was that, "[i]f the order made by the public utilities com-

In 1925, the territorial legislature amended RLH § 2234. However, the amendment was nonsubstantive, altering only the numerical designation of the statute from RLH § 2234 to RLH § 2202. *See* 1925 Haw.Sess.L. Act 173, § 1 at 197–98. Section 2202 was later amended in several respects. *See* 1933 Haw. Sess.L. Act 169, § 2 at 188–89. One of the 1933 amendments changed the direct appeal language "[f]rom every order made by the commission under the provisions of *this section* an appeal shall lie to the supreme court of Hawaii" (emphasis added) to "[f]rom every order made by the commission under the provisions of *this chapter* an appeal shall lie to the supreme court of Hawaii" (emphasis added). This is substantially the language currently contained in HRS § 269–16(f). Unfortunately, there is no legislative history that explains the 1933 amendments.

■■■■■ While it might appear that the 1933 amendment allowing for a direct appeal "under the provisions of this chapter" was intended to permit the direct appeal of *any* final order "made by" the PUC, rather than merely *ratemaking* orders, such an interpretation is inconsistent with later amendments. Following a number of subsequent amendments, which are irrelevant to the disposition of this appeal, RLH § 2202 ultimately became HRS § 269–16 in 1967 and took its present form in 1973. A 1976 amendment, *inter alia*, added the present language authorizing a direct appeal "only by a person aggrieved in the contested case hearing provided for *under this section*." (Emphasis added.) *See* 1976 Haw.Sess.L. Act 10, § 1 at

mission ... violates the legal rights of the [aggrieved party,] the mode of judicial relief against the order is by ... appropriate proceedings before a ... court having original jurisdiction of such matters, the proceedings before that court being, of course, reviewable here," *Id.* at 334–35.

By the dissent's logic, the *Honolulu Rapid Transit* court should have accepted original jurisdiction over the direct appeal of the PUC's order on the ground that it related to the PUC's "practices". *See* dissenting opinion at 333–334, 944 P.2d at 1276–77. Instead, *Honolulu Rapid Transit & Land Co.* merely confirms that the dissent's effort to transform *any* PUC order into an order pertaining to one of its "practices" is a red herring.

15–16. According to the legislative history underlying the 1976 amendment,

> [t]he purpose of this bill [amending HRS § 269–16] is to improve the procedures of the Public Utilities Commission in regulating the rates, fares, and charges which public utilities charge for their services.
>
> . . . .
>
> [T]he bill ... clarif[ies] the law covering appeal procedures. As amended, the bill provides that *only parties to a contested case proceeding, commonly referred to [as] an economic hearing, have the right to appeal a decision of the Public Utilities Commission to the Hawai['Ji Supreme Court.*.

Sen.Stand.Comm.Rep. 507–76, in 1976 Senate Journal, at 1101; Hse. Stand.Comm.Rep. No. 513–76, in 1976 House Journal, at 1501. (Emphasis added.) Thus, in amending HRS § 269–16, the legislature clearly intended that a direct appeal to this court only be allowed in a subset. of the contested case proceedings conducted before the PUC, namely, those contested cases "commonly referred to" as "economic hearing[s]"; accordingly, it appears that a contested case hearing "under this section" could only mean a contested case hearing in a ratemaking case. Therefore, while HRS § 269–16(f) *generally* addresses the subject of appeals "from every order made by the commission under this chapter," the same subsection *specifically* limits the right of direct appeals to this court—thereby bypassing the normal judicial review conducted in the circuit court in the first instance pursuant to HRS § 91–14(b), *see supra* note 2—to those taken by "a person aggrieved in the contested case hearing[6]

6. Although this opinion is primarily concerned with the right, as a matter of appellate *jurisdiction*, of a claimant to bring a direct appeal to this court from a PUC order that does not deal with "regulation of rates" or "ratemaking procedures," nothing in this opinion should be read to alter the requirement, as a matter of *standing*, that the claimant be one "aggrieved in the *contested case* hearing provided for under this section ..." (Emphasis added.) "A contested case is an agency hearing that 1) is required by law and 2) determines the rights, duties, or privileges of specific parties." *Public Access Shoreline Hawai'i v. Hawai'i County Planning Comm'n*, 79 Hawai'i 425, 431, 903 P.2d 1246, 1252 (1995), *cert denied*, —— U.S. ——, 116 S.Ct. 1559, 134 L.Ed.2d 660 (1996). Therefore, under HRS

provided for under this section," which, pursuant to HRS § 269–16(a), pertains exclusively to "ratemaking."

■■■ That the only legislative purpose underlying HRS § 269–16 is, indeed, to further the "regulation of rates" charged by public utilities is evident from the history that accompanied amendments to the statute subsequent to 1976. The committee reports accompanying the 1982 amendment of HRS § 269–16 explained that "[t]he purpose of [the amendment] is to allow the [PUC] to vary its rules and regulations regarding procedures followed in its *economic regulation of public utilities.*" Sen.Stand.Comm.Rep. No. 603–82, in 1982 Senate Journal, at 1204; Hse. Stand.Comm.Rep. No. 506–82, in 1982 House Journal, at 1121. (Emphasis added.) In 1983, the legislature changed the title of HRS § 269–16 ·from "[r]egulate rates, etc., hearings, notice of hearings, appeals" to "[r]egulation of utility rates; ratemaking procedures." *See* 1983 Haw.Sess.L. Act 98, § 2 at 169. Finally, the purpose of the 1984 amendment was "to provide the [PUC] with statutory authorization to render interim decisions *granting rate relief* to a utility until such time as the [PUC] is able to render a final decision on the appropriate amount of *permanent rate relief* to which a utility company may be entitled." Sen.

Stand.Comm.Rep. No. 560–84, in 1984 Senate Journal, at 1278; Hse.Stand.Comm.Rep. No. 305–84, in 1984 House Journal, at 960. (Emphases added.) Thus, there can be no doubt that the legislature intended that HRS § 269–16 deal only with the power of the PUC to regulate *rates.* That being the case, it therefore follows that a direct appeal "under this section" can only be taken to this court from a PUC order pertaining to "regulation of rates" or "ratemaking procedures."

### 2. The bottom line

■■■ Based on the foregoing, we hold that, under § 269–16(f), a direct appeal from a PUC order lies to this court only when the PUC order pertains to "regulation of utility rates" or "ratemaking procedures." Therefore, because D & O No. 13198 was not an order pertaining to the "regulation of utility rates" or "ratemaking procedures," but, rather, merely addressed the placement of HELCO's PTL No. 2 in accordance with D & O No. 10620, we hold that this court, pursuant to § 269–16(f), lacks appellate jurisdiction to hear this direct appeal.[7]

### III. CONCLUSION

For the foregoing reasons, we dismiss this appeal for want of appellate jurisdiction.[8]

---

§ 269–16(f), the claimant must demonstrate, first, that the order from which he or she appeals pertains to "regulation of rates" or "ratemaking procedures" and, second, that he or she is a "person aggrieved in a contested case."

Obviously, Peterson has standing to appeal D & O No. 13198, inasmuch as he is a "person aggrieved in a contested case." *See infra* note 8. That, however, does *not* mean, as the dissent suggests, that "a direct appeal to the supreme court may be had from *every* order made by the [PUC] under [HRS] chapter 269." *See* dissenting opinion at 332, 944 P.2d at 1275 (emphasis in original). To construe HRS § 269–16(f) in that fashion would require us to ignore the applicability of HAPA in general, *see* HRS §§ 269–16(a) and (b), and HRS § 91–14 in particular, *see* HRS § 269–16(f), to contested cases conducted before the PUC. *See also infra* note 8.

7. We have previously held that "[a]n appeal to this court from a *rate* order of the PUC is authorized by Sec. 269–16(f)." *In re Application of Miller and Lieb Water Co.,* 65 Haw. 310, 311, 651 P.2d 486, 488 (1982)(emphasis added). However, we have also held more broadly, without explanation, that "[u]nder the provisions of HRS

§ 269–16(f), an appeal from a 'final' order of the PUC is taken to the supreme court." *In re Application of Hawaiian Elec. Co.,* 81 Hawai'i 459, 464, 918 P.2d 561, 567 (1996). A review of all cases decided by this court that have come from a direct appeal of a PUC order reveals three that have not been from a PUC order dealing with "rates." *See id.* (appeal from PUC order granting utility's application to commit funds for construction of high-voltage overhead transmission lines); *In re Application of Wind Power Pac. Investors–III,* 67 Haw. 342, 686 P.2d 831 (1984) (appeal from a decision of the PUC granting certification as a qualifying small power production facility); *Jones v. Hawaiian Elec. Co.,* 64 Haw. 289, 639 P.2d 1103 (1982) (appeal from a PUC order dismissing a complaint by utility subscribers requesting the PUC to disallow a lease agreement). Inasmuch as these cases did not deal with PUC "rate" orders, and being unaware of any other jurisdictional basis under which review would have been appropriate, this court should not have decided these cases. However, because all three decisions affirmed the PUC orders in question, the appellants were accorded no relief beyond that originally granted by the PUC.

RAMIL, Justice, dissenting.

I respectfully dissent. In my view, the majority incorrectly reads the language of HRS § 269–16 to limit appellate jurisdiction. A direct appeal to the supreme court from every order made by the commission under chapter 269 may be made only by a *"person aggrieved* in the contested case hearing," the procedures of which are "provided for" or laid out in HRS § 269–16. The majority opinion appears to acknowledge this reading of HRS § 269–16, majority at 328–329, 944 P.2d at 1271–72, yet proceeds to construe the statute in an excessively narrow manner.

In *Pele Defense Fund v. Puna Geothermal Venture,* 77 Hawai'i 64, 881 P.2d 1210 (1994), we held that "[s]tanding is concerned with whether the parties have the right to bring suit. Subject matter jurisdiction is concerned with whether the court has the power to hear a case." *Id.* at 67, 881 P.2d at 1213 (citation and internal quotation marks omitted). The wording of HRS § 269–16(f) reflects these concepts and is not ambiguous:

> ■ From *every order* made by the commission *under this chapter* that is final or, if preliminary, is of the nature defined by section 91–14(a), an appeal shall lie to the supreme court ... [2] *only by a person aggrieved in the contested case hearing* [3] *provided for under this section ....*

(Emphases added.) Part 1 of the statute clearly states that a direct appeal to the supreme court may be had from *every* order made by the commission under chapter 269. In parts 2 and 3, HRS § 269–16(f) goes on to give standing only to one who is "aggrieved" because he or she has participated in a· contested case hearing as provided for under HRS § 269–16. The majority imposes the word "section" as an additional requirement of appellate jurisdiction when it is found in that portion of the sentence that places a restriction on standing.

The majority goes on to acknowledge that the scope of a contested case hearing is provided for under HRS § 269–16(a), and "is limited to 'all rates, fares, charges, classifications, schedules, rules, and practices made, charged, or observed by any public utility.'" Majority at 328–329, 944 P.2d at 1271–72. At this point, I disagree with the opinion's legal analysis insofar as it results in the conclusion that appeals are limited only to "ratemaking" cases.

Relying first on *Honolulu Rapid Transit & Land Co., supra,* the majority states that "we dismissed the direct appeal of a PUC order requiring the transit company to remove certain street railway tracks, *holding that the non-ratemaking order at issue was not directly appealable to this court ....*" Majority at 329, 944 P.2d at 1272 (some emphasis in original and some added.) Unfortunately, the holding was far from being this succinct, and consisted of the following:

> Whether the public utilities commission was properly acting within the scope of its' power and authority we are not now called upon to determine but we think it obvious that the commission was not attempting to regulate rates, fares, charges, classifications, rules and practices charged or observed by the public utility and for this reason no appeal lies to the supreme court in the first instance.

*Honolulu Rapid Transit & Land Co.,* 25 Haw. at 334. What this decision does tell us is that in 1919, under RLH § 2234, an order by the PUC requiring Honolulu Rapid Transit and Land Company to move its street railway tracks could not be appealed directly to the supreme court. The opinion fails to provide any insight into how the court reached this conclusion.

It is also questionable whether this case is even relevant today in light of the subsequent amendments to the applicable PUC statutes. In 1933, the legislature changed the wording from "this *section* " to "this *chapter.*" Majority at 330, 944 P.2d at 1273 (emphasis added.) What this does suggest is that the legislature intended to broaden the

---

8. Nothing in this opinion should be read to mean that claimants appealing PUC "non-ratemaking" orders do not have recourse to appellate review. The proper course is to seek review by the circuit court in the first instance. *See supra* note 2.

Simply put, Peterson's mistake was in not seeking review by the circuit court, pursuant to HRS § 91–14, *see supra* note 2, in the first instance, instead of appealing directly to this court, after the PUC issued D & O No. 13198.

scope of PUC orders from which one could file an appeal directly to the supreme court. In 1976, the legislature further refined HRS § 269–16 by adding a standing provision: "only by a person aggrieved in the contested case hearing provided for under this section." The legislative history of the 1976 amendment states that it *clarifies* "the law covering appeal procedures" by focusing on the issue of standing.

Nor is the fact that the legislature amended the title of HRS § 269–16 of great significance. Majority at 331, 944 P.2d at 1274. This court expressly rejected this argument in *State v. Lau,* 78 Hawai'i 54, 890 P.2d 291 (1995), when it overruled *State v. Leatiota,* 69 Haw. 253, 739 P.2d 930 (1987). The *Leatiota* court had held that Hawai'i Rules of Penal Procedure Rule 48 did not apply to driving under the influence (DUI) charges because DUI was a "traffic" offense as opposed to a "criminal" offense. In *Lau,* we discovered that the underlying rationale behind the decision in *Leatiota* had been that DUI appeared "in a chapter of the HRS entitled 'Traffic Violations.'" *Lau,* 78 Hawai'i at 58, 890 P.2d at 295:

> [u]nder this rationale, all offenses under HRS Chapter 291 would be "traffic offenses" and exempt from dismissal pursuant to HRPP Rule 48. In addition, because HRS Chapter 291C is entitled "Traffic Code," all offenses under Chapter 291C would also be exempt from dismissal pursuant to HRPP Rule 48. However, in light of the many provisions under Chapter 291 and 291C that authorize a term of imprisonment, we believe that such a bright line rule would unjustifiably give dispositive weight to the mere title of a chapter and exclude the very type of offense HRPP Rule 48 was designed to cover. The mere fact that an offense is related to the operation of a vehicle should not automatically exempt the application of HRPP Rule 48.

*Lau,* 78 Hawai'i at 58–59, 890 P.2d at 295–96. Similarly, the title of HRS § 269–16—"[r]egulation of utility rates; ratemaking procedures"—does not limit appeals to ratemaking issues alone.

Despite the fact that a "contested case" proceeding is *often* referred to as an "economic hearing," it does not follow automatically that "a contested case hearing 'under this section' could *only* mean a contested case hearing in a ratemaking case." Majority at 330, 944 P.2d at 1273 (emphasis added). Simply because the legislature has noted that contested case hearings are commonly known as "economic hearings," this does not mean that "economic hearings," absent further clarification or explanation, could only refer to ratemaking issues. In fact, HRS § 91–1(5) (1993) provides that a

> "Contested case" means a proceeding in which the legal rights, duties, or privileges of specific parties are required by law to be determined after an opportunity for an agency hearing.

An "agency hearing" is defined as follows:

> "Agency hearing" refers only to such hearing held by an agency immediately prior to a judicial review of a contested case as provided in section 91–14.

HRS § 91–1(6) (1993). Thus, a "contested case" could encompass a large spectrum of hearings.

Moreover, the word "economic" includes the following definition: "of, relating to, or based on the production, *distribution,* and consumption of goods and services[.]" *Webster's Collegiate Dictionary* 365 (10th ed. 1994) (emphasis added). In this case, the routing of HELCO's transmission lines, *i.e.,* their distribution, is at issue.

Additionally, both HRS §§ 269–16(a) and (b) clearly refer not only to ratemaking, but to "practices made" and "practices," as well. Therefore, even if the word "section" were interpreted as a limitation on the jurisdiction of this court, as the majority asserts, the plain language of HRS § 269–16 refers to more than ratemaking. The legislature intended that "practices made" and "practices" have some meaning other than "rates, fares, [and] charges." "Courts are bound to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all words of the statute." *State v. Kaakimaka,* 84 Hawai'i 280, 289–90, 933 P.2d 617, 626–27 (quoting *State v. Ortiz,* 74 Haw. 343, 351–52, 845 P.2d 547, 551–52, *reconsideration denied,* 74 Haw. 650, 849 P.2d 81 (1993)), *reconsideration denied,* 84 Hawai'i 496, 936 P.2d 191 (1997).

334

Limiting direct appeals to the supreme court only when a PUC decision deals with utility rates or ratemaking procedures would render the words "practices made" or "practices" "superfluous or surplusage." *State v. Kwak*, 80 Hawai'i 297, 301, 909 P.2d 1112, 1116 (1995).

The legislature has realized the tremendous impact public utilities have on the general public and, in the interest of speedy resolution of disputes, has seen fit to permit appeals directly to the supreme court by persons aggrieved in contested case hearings before the PUC. The effect public utilities exert on the general public is not limited to those generated by rate changes alone, but included "*all* ... practices made," as evinced by the plain language of HRS § 269–16 (emphasis added). Accordingly, I believe that this court does have the jurisdiction, pursuant to HRS § 269–16(f), to hear this case.