165 P.3d 1027

Gail AWAKUNI; Janis Bush; Diane Kellet; Mona Stevenson; Sue Stock; Nancy Teruya and Raymond Uyeno, for Themselves and all other similarly situated Employees, Plaintiffs–Appellants,

v.

Bob AWANA; Harold Decosta; Mark Recktenwald; Katherine Thomason; Kathleen Watanabe; Willard Miyake; Joan Lewis; Gerald Machida; John Radcliffe; Dayton Nakaneiua; State of Hawai'i, Defendants–Appellees,

and

John Does 1–10, Defendants.

No. 27184.

Supreme Court of Hawai'i.

Aug. 24, 2007.

George W. Brandt, Bonnie Moore (Lyons, Brandt, Cook & Hiramatsu), Honolulu, and James N. Duca (Kessner Duca Umebayashi Bain & Matsunaga), Honolulu, on the briefs, for plaintiffs-appellants.

Brian P. Aburano, Deputy Attorney General, James Kawashima, Kristine Tsukiyama, (Watanabe Ing Kawashima & Komeiji LLP), Honolulu, Brian T. Ortelere, and Beth M. Henke (Morgan, Lewis & Bockius, LLP), on the briefs, for defendants-appellees.

NAKAYAMA, ACOBA, and DUFFY, JJ., and Circuit Judge MARKS, in place of LEVINSON, J., Recused; with MOON, C.J., concurring separately.

Opinion of the Court by DUFFY, J.

Plaintiffs–Appellants Gail Awakuni, Janis Bush, Diane Kellet, Mona Stevenson, Sue Stock, Nancy Teruya, and Raymond Uyeno, for themselves and all other similarly situated employees [hereinafter, Plaintiffs], appeal from the February 24, 2005 final judgment of the Circuit Court of the First Circuit, the Honorable Gary W.B. Chang presiding, which granted summary judgment in favor of Defendants–Appellees, the trustees of the Hawai‘i Employer–Union Benefits Trust Fund (EUTF), Bob Awana, Harold Decosta, Mark Recktenwald, Katherine Thomason, Kathleen Watanabe, Willard Miyake, Joan Lewis, Gerald Machida, John Radcliffe, and Dayton Nakaneiua [hereinafter, EUTF Board or Trustees], and the State of Hawai‘i [hereinafter, collectively with the Trustees, Defendants]. Based on the following, we affirm the final judgment of the circuit court.

## I. BACKGROUND

### A. Background on the EUTF

The EUTF was established to provide a single health benefits delivery system for State and county employees, retirees, and their dependents. Hawai‘i Revised Statutes

(HRS) §§ 87A–15,–31 (Supp.2001).[1] It replaced the Hawai'i Public Employees Health Fund (PEHF) on July 1, 2003. Act 88 of the 2001 Session Laws of Hawai'i, partially codified as HRS chapter 87A, sets forth the statutes governing the EUTF. It is administered by a board of ten trustees, appointed by the governor, who all serve without compensation. HRS §§ 87A–5,–8 (Supp.2001).[2] Five trustees represent the employee-beneficiaries and five trustees represent public employers. HRS § 87A–5.[3] The EUTF Trustees were responsible for, *inter alia*, establishing the health benefits plan or plans. HRS § 87A–16 (Supp.2001).[4]

As mandated by HRS § 87A–25(4) (Supp. 2001),[5] the EUTF procured and maintained fiduciary liability insurance and public officials and employment practices liability insurance. The EUTF is the named insured under the following policies underwritten by National Union Fire Insurance Company of Pittsburgh, Pennsylvania: (1) a Public Officials and Employment Practices Liability Policy in the amount of $3,000,000.00; and (2) a Fiduciary Liability Policy in the amount of $10,000,000.00. The policies cover the EUTF and its trustees, and the second policy also extends coverage to the State.

B. *Deciding on a Rate Structure*

The EUTF Trustees began meeting in January 2002. On June 28, 2002, Garner

Consulting [hereinafter, Garner] was hired as a benefits plan consultant, and was asked to determine the economic effect that various rate structures would have on future participants in the EUTF plans. Garner determined that at that time, United Public Workers utilized a four-tier plan—*i.e.*, one premium rate for single employees (individual rate), a second premium rate for employees with one dependent, a third rate for employees with two dependents, and a family rate for employees with three or more dependents—and the Hawai'i Government Employees Association utilized a three-tier plan—*i.e.*, individual rate, individual plus one dependent rate, and family rate for employees with two or more dependents. Two-tier rate structures—*i.e.*, an individual rate and a family rate for employees with one or more dependents—were being used by the PEHF, the Hawai'i State Teachers' Association, the University of Hawai'i Professional Assembly, the State of Hawai'i Organization of Police Officers, and the Hawai'i Fire Fighters Association (HFFA). Garner prepared charts for the Board, comparing the effects of implementing a two-tier structure as opposed to three-or four-tier structures. The charts showed that the smallest percentage of employees would be adversely affected by the EUTF using plans with a two-tier rate structure, *i.e.*, approximately 92% would

1. HRS § 87A–15 states that "[t]he board shall administer and carry out the purpose of the fund. Health and other benefit plans shall be provided at a cost affordable to both the public employers and the public employees."

 HRS § 87A–31 states in relevant part that "[t]he fund shall be used to provide employee-beneficiaries and dependent-beneficiaries with health and other benefit plans, and to pay administrative and other expenses of the fund." HRS § 87A–1 defines "Employee-beneficiary" to include "[a] retired member of the employees' retirement system; the county pension system; or the police, firefighters, or bandsmen pension system of the State or county" as well as "[a]n employee who retired prior to 1961 . . . ."

2. HRS § 87A–5 provides, in relevant part, that "[t]he board of trustees of the employer-union health benefits trust fund shall consist of ten trustees appointed by the governor. . . ." HRS § 87A–5 was amended in 2005, but such amendments are not pertinent to this case.

 HRS § 87A–8 states that "[e]ach trustee shall serve without compensation, but the trustees

may be reimbursed from the fund for any reasonable expenses incurred in carrying out the purposes of the fund."

3. The relevant portions of HRS § 87A–5 state that the Board shall consist of "[f]ive trustees, one of whom shall represent retirees, to represent employee-beneficiaries" and "[f]ive trustees to represent public employers."

4. HRS § 87A–16 provides:

 (a) The board shall establish the health benefits plan or plans, which shall be exempt from the minimum group requirements of chapter 431.

 (b) The board may contract for health benefits plans or provide health benefits through a noninsured schedule of benefits.

5. HRS § 87A–25 provides that "[t]he board shall: . . . . (4) Procure fiduciary liability insurance and error and omissions coverage for all trustees . . . ."

have the same or lower rates and 9% would have higher rates.

On or about August 8, 2002, the EUTF Board sent to the public employers and unions a "Summary of Health Benefits Plan" for their review and comment. The summary stated that the EUTF benefits committee had recommended that the EUTF adopt a two-tier rate structure. In response, it appears that only the County of Maui expressed concern over the use of a two-tier structure.

Just prior to issuing the request for proposals, the Board again considered the rate structure issue at a Board meeting. While at least one Trustee argued that a four-tier structure would be more equitable, other Trustees relied on the chart prepared by Garner and asserted, in relevant part, that: (1) a four-tier structure would increase the costs for those least able to afford it, *i.e.*, families with two or more dependents; (2) it would be "more prudent to stick with the current 2–tier structure" because collective bargaining was "geared to a 2–tier structure" and "a move to a 4–tier structure may. change the way collective bargaining is done"; and (3) "all plans are subject to inequity; large families are subsidized by others, high users are subsidized by lower users, etc."

After public meetings and consultation with public employers and unions, the EUTF Trustees established health benefits plans, effective July 1, 2003, with two tiers of insurance premium rates.

In or about April 2003, collective bargaining agreements setting forth public employer contributions to the EUTF health benefits plans were reached. The agreements provided for employer contributions on a two-tier basis.

In or about September 2003, the EUTF Board requested Garner to determine the effect of moving to a three-or four-tier rate structure. Garner requested proposed rates from the insurance carriers providing the EUTF health plans. One or more of the insurance carriers advised Garner that the proposed rates for three-or four-tier plans were dependent on all public employers and public sector unions agreeing to the same rate structure. If some chose different rate structures, the proposed rates would be different. Further, the current two-tier rates could also change if some public sector unions wanted to implement three-or four-tier plans for their members. Additionally, the Board sent a letter to the public employers and unions to see if they were interested in moving to a three-or four-tier rate structure. Only HFFA responded, stating that the existing two-tier structure should be maintained because "the unions have negotiated contribution rates based on the two-tier structure."

### C. *Procedural History*

On February 26, 2004, Plaintiffs, State and County employees with only one dependent whose health insurance is obtained through the EUTF,[6] brought the instant suit,[7] on behalf of themselves and others similarly situated, against Defendants alleging, *inter alia,* that: (1) the EUTF Trustees, by offering only two tiers of insurance premium rates rather than three or four tiers of premium rates, breached their fiduciary duties of loyalty and impartiality owed to all the beneficiaries of the EUTF because the two-tier plan overcharges and unfairly discriminates against two-member families; (2) the State was vicariously liable for the actions of the Trustees; and (3) the State was directly liable for negligently training and advising the Trustees with respect to their duties and obligations to the beneficiaries of the EUTF.

On March 1, 2004, Defendants filed a "Motion to Dismiss Complaint or in the Alternative for Summary Judgment." The matter

---

**6.** Plaintiffs Awakuni and Kellet apparently did not have a dependent whose health insurance was obtained through the EUTF, but "joined as Plaintiffs because they wished to have the option to purchase insurance through the EUTF at a reasonable and proper cost for themselves and another eligible insured."

**7.** The complaint was initially filed on December 18, 2003 against the Trustees. The First Amended Complaint was filed on January 27, 2004 and added the State as a defendant. The Second Amended Complaint was filed on February 26, 2004.

was heard on October 22, 2004. Both parties subsequently filed supplemental memoranda regarding the discretionary function exception to the State Tort Liability Act (STLA), HRS chapter 662. By order dated February 15, 2005, the circuit court, "having found no genuine issue as to any material fact and that Defendants are entitled to judgment as a matter of law," granted Defendants' motion for summary judgment. Final judgment was entered in favor of Defendants and against Plaintiffs on all claims on February 24, 2005. On March 17, 2005, Plaintiffs filed their timely notice of appeal.

On March 27, 2007, Defendants filed a timely motion to retain oral argument, which this court granted on April 26, 2007. Oral argument for this case was held on July 11, 2007.

## II. STANDARDS OF REVIEW

### A. Summary Judgment

■ We review the circuit court's grant or denial of summary judgment *de novo*. *Hawaii [sic] Community Federal Credit Union v. Keka*, 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000). The standard for granting a motion for summary judgment is settled:

> [S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the nonmoving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Id.* (citations and internal quotation marks omitted).

*Coon v. City and County of Honolulu*, 98 Hawai'i 233, 244–45, 47 P.3d 348, 359–60 (2002) (second alteration in original).

*Kau v. City & County of Honolulu*, 104 Hawai'i 468, 473–74, 92 P.3d 477, 482–83 (2004). This court has further explained the burdens of the moving and non-moving parties on summary judgment as follows:

> The burden is on the party moving for summary judgment (moving party) to show the absence of any genuine issue as to all material facts, which, under applicable principles of substantive law, entitles the moving party to judgment as a matter of law. This burden has two components.
>
> First, the moving party has the burden of producing support for its claim that: (1) no genuine issue of material fact exists with respect to the essential elements of the claim or defense which the motion seeks to establish or which the motion questions; and (2) based on the undisputed facts, it is entitled to summary judgment as a matter of law. Only when the moving party satisfies its initial burden of production does the burden shift to the non-moving party to respond to the motion for summary judgment and demonstrate specific facts, as opposed to general allegations, that present a genuine issue worthy of trial.
>
> Second, the moving party bears the ultimate burden of persuasion. This burden always remains with the moving party and requires the moving party to convince the court that no genuine issue of material fact exists and that the moving part is entitled to summary judgment as a matter of law.

*French v. Hawaii Pizza Hut, Inc.*, 105 Hawai'i 462, 470, 99 P.3d 1046, 1054 (2004) (quoting *GECC Fin. Corp. v. Jaffarian*, 79 Hawai'i 516, 521, 904 P.2d 530, 535 (App. 1995)).

### B. Statutory Interpretation

■ Statutory interpretation is "a question of law reviewable *de novo*." *State v. Levi*, 102 Hawai'i 282, 285, 75 P.3d 1173, 1176 (2003) (quoting *State v. Arceo*, 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996)). This court's statutory construction is guided by established rules:

First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. And fifth, in construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning.

*Peterson v. Hawaii Elec. Light Co., Inc.*, 85 Hawai'i 322, 327–28, 944 P.2d 1265, 1270–71 (1997), *superseded on other grounds by* HRS § 269–15.5 (Supp.1999) (block quotation format, brackets, citations, and quotation marks omitted).

## III. *DISCUSSION*

### A. *The EUTF Trustees Did Not Abuse Their Discretion in Adopting a Two–Tier Rate Structure.*

Plaintiffs claim that: (1) the EUTF Trustees have the fiduciary duties of common law trustees; and (2) the EUTF Trustees' violated their fiduciary duty of impartiality in adopting a two-tier rate structure. Defendants reply that: (1) "the use of general trust language does not impose the full panoply of common law fiduciary duties"; (2) the Trustees were granted broad discretion to design and establish the EUTF plans, and such discretion is not subject to court control except to prevent abuse thereof; and (3) the EUTF Trustees did not abuse their discretion in selecting and maintaining a two-tier rate structure. We agree with Defendants.

### 1. **Whether the EUTF Trustees owe common law fiduciary duties to Plaintiffs**

 Although HRS chapter 87A utilizes general trust terminology, it is clear that the EUTF is not a typical common law trust such that the Trustees are subject to all of the common law fiduciary duties. For example, under the common law, a trustee owes a duty of loyalty to the beneficiaries, *i.e.,* to administer the trust solely in the interest of the beneficiaries. *See* Restatement (Third) of Trusts: Prudent Investor Rule § 170(1) ("The trustee is under a duty to administer the trust solely in the interest of the beneficiaries."). In the case of the EUTF, however, the design and establishment of health benefits plans is not to be done solely in the interests of the employee-beneficiaries. Rather, according to HRS § 87A–5 and–15, *supra* notes 2 & 4, half of the EUTF trustees represent the public employers, and the health benefits plans are to be provided at a cost affordable to both the public employers and the public employees. Further, the legislative history of chapter 87A states that one of the main purposes of creating the EUTF was to establish a single health benefits delivery system to make the cost of insurance affordable for the State. Conf. Comm. Rep. No. 124, in 2001 House Journal, at 1097–98. Thus, HRS chapter 87A's use of general trust language does not impose upon the EUTF Trustees all of the common law fiduciary duties.

This conclusion is supported by the Court of Appeals of the Ninth Circuit's decision in *Price v. Hawai'i*, 921 F.2d 950, 955–56 (9th Cir.1990). Therein, the Ninth Circuit held that the use of the term "public trust" in section 5(f) of the Hawai'i Admission Act did not subject the State to all aspects of common law trust duties. The court reasoned:

> [N]othing in that statement indicates that the parties to the compact agreed that all provisions of the common law of trusts would manacle the State as it attempted to deal with the vast quantity of land conveyed to it for the rather broad, although not all-encompassing, list of public purposes set forth in section 5(f).

921 F.2d at 955. Here, as in *Price,* the use of trust terminology does not subject the EUTF Trustees to all provisions of the common law of trusts.

Furthermore, as the Restatement (Third) of Trusts § 1, cmt. a(1) states:

> Several bodies of state and federal legislation dealing with various types of charitable, public, or pension (governmental and private) funds expressly or impliedly incorporate rules of the general trust law that is the subject of this Restatement. See Reporter's Notes. See also § 90, Comment a (Restatement Third, Trusts (Prudent Investor Rule) § 227, Comment a); and Reporter's General Notes to § 90 (id. § 227). See also Uniform Management of Institutional Funds Act, briefly discussed in the Reporter's Notes on § 67.
>
> The principles of this Restatement are generally appropriate to those statutory bodies of rules, both by analogy and insofar as those rules expressly or impliedly incorporate general principles of trust law. *Specific provisions and special circumstances or relationships involved in the application of those statutory rules, however, often present fundamentally different considerations, thus expressly or impliedly calling for application of different rules that are not within the scope of this Restatement* except ·as similar circumstances are taken into account in the elaboration of general trust-law principles.

(Emphasis added.) It is therefore apparent that, rather than relying entirely on the common law of trusts, we must take into consideration the "[s]pecific provisions and special circumstances" of the EUTF, as expressed in the statutory language of HRS chapter 87A and its legislative history, in determining how to review the Trustees' decision to adopt a two-tier rate structure.

## 2. The Trustees' decision to adopt a two-tier rate structure is subject to a review for an abuse of discretion.

HRS chapter 87A does not expressly provide whether the EUTF Trustees owe to the employee-beneficiaries the common law fiduciary duty of impartiality in determining the rate structure of the health benefits plan. According to Plaintiffs, this silence indicates that the fiduciary duty of impartiality applies to the Trustees because "[n]othing in Chapter 87A modifies the common law duties of trustees, or suggests that the EUTF trustees were vested with discretion to ignore or override their fiduciary duty of impartiality. In fact, the word 'discretion' appears nowhere in the text of Chapter 87A." [8] Defendants reply that "[a] grant of discretionary authority does not hinge on incantations of the word 'discretion' or any other magical word."

---

**8.** Plaintiffs also allege that the statute's silence with respect to the Trustees' fiduciary duties indicates that the legislature intended to impose on the Trustees all of the common law fiduciary duties, arguing that "[w]here a statute creates a statutory trust relationship, '[courts] must infer that [the legislature] intended to impose on trustees traditional fiduciary duties *unless* [the legislature] *has unequivocally expressed an intent to the contrary.'* " (Emphases in original.) (Quoting *Cobell v. Norton*, 283 F.Supp.2d 66, 145 (D.D.C. 2003), *vacated in part on other grounds by* 392 F.3d 461, (D.C.Cir.2004).) Plaintiffs misconstrue the court's decision in *Cobell*. The issue therein was whether the 1994 Indian Trust Fund Management Reform Act altered the nature or scope of the fiduciary duties—described as "the 'most exacting fiduciary standards' of the common law"—*already owed* by the government to Individual Indian Money (IIM) trust beneficiaries. *Cobell*, 283 F.Supp.2d at 144–45. The court stated:

> Enactment of the Indian Trust Fund Management Reform Act in 1994 did not alter the nature or scope of the fiduciary duties owed by the government to IIM trust beneficiaries. Rather, by its very terms the 1994 Act identified a portion of the government's specific obligations and created additional means to ensure

that the obligations would be carried out. Indeed, the 1994 Act explicitly reaffirmed the Interior Secretary's obligation to fulfill the "trust responsibilities of the United States." *From this express language, we must infer that Congress intended to impose on trustees traditional fiduciary duties unless Congress has unequivocally expressed an intent to the contrary. Id.* at 145 (emphasis added). When read in the context of the case, it is apparent that the language quoted by Plaintiffs was intended to convey that the Act did not alter the imposition of traditional fiduciary duties on the trustees. Thus, *Cobell* is clearly inapplicable here. Rather, Plaintiffs' citation to *Branch v. White*, which states that "[t]he extent of the duties of a trustee depends primarily upon the terms of the trust," 99 N.J.Super. 295, 239 A.2d 665, 671 (Ct.App. Div.1968) (citing 2 Scott, *Trusts* § 164 at 1254 (3d ed.1967)), presents a more tenable contention. *See also* Restatement (Third) of Trusts § 4 cmt. g (stating that the terms of a statutory trust "are either set forth in the statute or are supplied by the default rules of general trust law"). Therefore, we must look to the terms of the statute to determine the parameters of the EUTF Trustees' powers and duties.

(Citing *Block v. Pitney Bowes, Inc.*, 952 F.2d 1450, 1453 (D.C.Cir.1992).). We agree with Defendants. Although the text of chapter 87A does not use the word "discretion" in requiring the Board to decide upon the structure of the health benefits plan, the legislature clearly intended that the Board have broad discretion in its design. Therefore, the Trustees' decision to adopt a two-tier structure is reviewed for an abuse of discretion.

This court has recognized that "[w]here discretion is conferred upon a trustee with respect to the exercise of a power, its exercise is not subject to interference by the court except to prevent an abuse by the trustee of his discretion." *Miller v. First Hawaiian Bank*, 61 Haw. 346, 351, 604 P.2d 39, 43 (1980) (citing *Dowsett v. Hawaiian Trust Co.*, 47 Haw. 577, 581, 393 P.2d 89, 93 (1964); Restatement (Second) of Trusts § 187 (1959)). Here, contrary to Plaintiffs' contention, it is apparent that the Trustees were granted discretion with respect to the design of the health benefits plan rate structure. HRS § 87A–16 provides that "[t]he Board shall establish the health benefits plan or plans...." Chapter 87A does not provide any guidance for the development of such plans, but only states in HRS § 87A–15 that the plans "shall be provided at a cost affordable to both the public employers and the public employees." By empowering the Trustees to establish the health benefits plan, the legislature granted the Trustees discretion in developing the plan. *Cf. Citizens Against Reckless Dev. v. Zoning Bd. of Appeals*, 114 Hawai'i 184, 194–95, 159 P.3d 143, 153–54 (2007) ("By empowering agencies generally with the authority to adopt rules regarding the manner in which declaratory ruling petitions shall be considered and disposed of, the legislature has granted agencies discretion with regard to the consideration of declaratory rulings."). The legislative history of chapter 87A strongly supports this interpretation. The conference committee report states that "[t]his bill will give the governing boards of the Trust Fund and the Health Fund, during the transition period, *complete discretion, authority, and flexibility* to devise and maximize the levels and types of benefits available for public employ-ees and retirees." Conf. Comm. Rep. No. 124, in 2001 House Journal, at 1098. Thus, broad discretion was conferred upon the EUTF Trustees with respect to the structure of the health benefits plans. As such, the Trustees' decision to adopt a two-tier rate structure is subject only to review for an abuse of discretion. *See Miller*, 61 Haw. at 351, 604 P.2d at 43.

**3. The Trustees did not abuse the broad discretion they were granted to devise the structure of the health benefits plan.**

Plaintiffs contend that even if the Trustees' decision is reviewed for an abuse of discretion, the Trustees abused this discretion because "the violation of a legal duty or principle, in this case the duty of impartiality, would go outside the bounds of reasonable judgment and discretion." (Citing 3 *Scott on Trusts* § 187 (4th ed.2001).) We disagree that the Trustees abused their discretion in adopting the two-tier rate structure.

This court has established that "[a]n abuse of discretion occurs when the decisionmaker 'exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party.'" *In re Water Use Permit Applications*, 94 Hawai'i 97, 183, 9 P.3d 409, 495 (2000) (quoting *Bank of Hawaii v. Kunimoto*, 91 Hawai'i 372, 387, 984 P.2d 1198, 1213 (1999)). Even assuming, *arguendo*, that the Trustees' decision was subject to a duty of impartiality, the Trustees did not abuse their discretion in adopting a two-tier rate structure.

The Restatement (Third) of Trusts § 79, discussing the duty of impartiality, states:

(1) A trustee has a duty to administer the trust in a manner that is impartial with respect to the various beneficiaries of the trust, requiring that:

(a) in investing, protecting, and distributing the trust estate, and in other administrative functions, the trustee must act impartially and with due regard for the diverse beneficial interests created by the terms of the trust....

Here, by virtue of the terms and purpose of the EUTF, the Trustees could not treat every beneficiary equally. Any plan that the Trustees chose could not have pleased all of the beneficiaries. For example, had the Board chosen to adopt a three-tier structure, those employees who had two dependents could have argued that the three-tier structure was inequitable and that a four-tier structure would be more equitable. In turn, had the Board adopted a four-tier structure, those employees who had three dependents could have argued that a five-tier structure would be more equitable. Indeed, as the comment to the Restatement notes, "[i]t would be overly simplistic, and therefore misleading, to equate impartiality with some concept of 'equality' of treatment or concern—that is, to assume that the interests of all beneficiaries have the same priority and are entitled to the same weight in the trustee's balancing of those interests." Restatement (Third) Trusts § 79 cmt. b. The comment goes on to explain:

> It is not only appropriate but required by the duty of impartiality that a trustee's treatment of beneficiaries, and the balancing of their competing interests, reasonably reflect any preferences and priorities that are discernable from the terms (§ 4), purposes, and circumstances of the trust and from the nature and terms of the beneficial interests.

Here, in deciding on a rate structure, the Trustees were required to not only balance the competing interests of the public employers and the different groups of employee-beneficiaries, but also had to consider the effects that the chosen structure would have on the employee-beneficiaries as a whole, including the impact their decision would have on collective bargaining. As recognized in *Hearst v. Ganzi,* "a trustee must act impartially with respect to all beneficiaries, doing his or her best for the *entire trust as a whole.*" 145 Cal.App.4th 1195, 52 Cal. Rptr.3d 473, 481 (2006) (quoting 76 Am. Jur.2d *Trusts* § 359 (2005)). Even assuming, *arguendo,* that a four-tier structure would have been the most equitable choice if collective bargaining and the effects of changing from previous rate structures were not at issue, the Trustees were not operating in

such a vacuum. As mentioned above, in discussing which rate structure to adopt, the Trustees considered the rate structures from which the employees would be transferring-as set forth in Section I.B, *supra,* five unions had two-tier structures, one union had a three-tier structure, and only one union had a four-tier structure—and expressed concern regarding the impact the change to a three- or four-tier structure would have on the collective bargaining process, which was geared toward a two-tier structure. The Trustees also determined that a two-tier structure would have a negative impact on the smallest percentage of EUTF participants. Defendants clearly satisfied their burden of producing evidence that the Trustees acted properly and with the terms and purpose of the EUTF in mind. Plaintiffs, however, failed to produce specific facts showing that the Trustees abused their discretion. Rather, Plaintiffs merely rely on their repeated argument that a two-tier system is inherently inequitable. Accordingly, there is no genuine issue of material fact for trial regarding whether the Trustees abused their discretion in adopting a two-tier rate structure, and the circuit court did not err in awarding summary judgment in favor of Defendants. We discuss Plaintiffs' remaining arguments in turn.

B. *The EUTF Trustees Are Immune from Suit Under HRS § 26–35.5(b) (1993) Because They Are Members of a State Board and There Were No Genuine Issues of Material Fact as to Whether Any Trustee Acted Maliciously or with an Improper Purpose in Deciding to Adopt a Two–Tier Rate Structure.*

Plaintiffs argue that the statutory immunity from civil damages under HRS § 26–35.5(b) does not justify the dismissal of Plaintiffs' claims against the individual Trustees because: (1) HRS § 87A–25(4) mandated a waiver of immunity; (2) the Trustees were not "members" of a "state board" as those terms are used in HRS § 26–35.5; and (3) there are genuine issues of material fact regarding whether the Trustees acted with a malicious or improper purpose. Defendants maintain that the Trustees are immune from

civil damages under HRS § 26–35.5(b) because they are clearly "members" of a "state board" and their actions were not for a malicious or improper purpose. We agree with Defendants.

HRS § 26–35.5, entitled "Members of boards and commissions; immunity from or indemnification for civil liability; defense of members," provides, in relevant part:

(a) For purposes of this section, "member" means any person who is appointed, in accordance with the law, to serve on a temporary or permanent state board, ... established by law....

(b) Notwithstanding any law to the contrary, *no member shall be liable in any civil action founded upon a statute or the case law of this State, for damage, injury, or loss caused by or resulting from the member's performing or failing to perform any duty which is required or authorized to be performed by a person holding the position to which the member was appointed,* unless the member acted with a malicious or improper purpose, except when the plaintiff in a civil action is the State.

· **1. HRS § 87A–25(4) does not mandate a waiver of HRS § 26–35.5(b) immunity.**

█ Plaintiffs contend that "[e]ven if the EUTF trustees may qualify for sovereign or other immunity (i.e., pursuant to HRS § 26–35.5(b)), the evident intention of HRS § 87A–25(4) was to mandate a waiver of immunity as to fiduciary liability, errors and omissions." Plaintiffs, however, do not provide

any support for their assertion. Defendants, for their part, assert that the legislature's insurance requirement was not intended to waive immunity, but was intended to cover claims against the State and the EUTF's Trustees by EUTF employee-beneficiaries (many of whom reside in other states and foreign countries) in federal court, other state courts, or foreign courts, where the Trustees are not immune. HRS § 87A–25(4), *supra* note 5, requires the Trustees to procure insurance; it says nothing of waiving immunity. Accordingly, Plaintiffs' contention that HRS § 26–35.5(b) immunity is waived is without merit.

**2. The Trustees are "members" of a "state board" pursuant to HRS § 26–35.5.**

█ Plaintiffs support their assertion that the EUTF Board is not a "state board" as that term is used in HRS § 26–35.5 with the following reasons: (1) the EUTF Trustees do not take an oath of office (citing Haw. Const. art. XVI, § 4 [9]); (2) they do not sit *ex officio* by virtue of their position with any state agency; (3) they are not elected (citing HRS § 87A–5); (4) their appointment is not subject to the advice and consent of the Senate (citing HRS § 87A–5, which exempts Trustees from application of HRS § 26–34(a) (1993) [10]); (5) although they are appointed by the governor, they do not serve at her pleasure, and she may not remove them from office (citing HRS § 87A–5, which exempts Trustees from application of HRS § 26–34(d) [11]); (6) they are not bound by the State Procurement Code, HRS chapter 103D (citing HRS §§ 87A–18(c),–20,–24 (Supp.2003) [12]

9. Haw. Const. art. XVI, § 4 provides:
 All eligible public officers, before entering upon the duties of their respective offices, shall take and subscribe to the following oath or affirmation: "I do solemnly swear (or affirm) that I will support and defend the Constitution of the United States, and the Constitution of the State of Hawaii, and that I will faithfully discharge my duties as ... to best of my ability." As used in this section, "eligible public officers" means *the governor, the lieutenant governor, the members of both houses of the legislature, the members of the board of education, the members of the national guard, State or county employees who possess police powers, district court judges, and all those whose appointment requires the consent of the senate.*

(Emphasis added.) · (Ellipsis in original.)

10. HRS § 26–34(a) states that "[t]he members of each board and commission established by law shall be nominated and, by and with the advice and consent of the senate, appointed by the governor."

11. HRS § 26–34(d) provides that "[t]he governor may remove or suspend for cause any member of any board or commission after due notice and public hearing."

12. HRS § 87A–18(c) states that "[w]ithout regard to chapter 103D, the board may contract with a carrier to provide fully insured benefits or

); (7) they are not bound by, nor are their actions reviewable under, the State Administrative Procedures Act, HRS chapter 91 (citing HRS §§ 87A–19,–26 (Supp.2003)[13]); (8) they are not subject to any executive department; (9) they do not deal with public assets or public funds (citing HRS § 87A–30 (Supp. 2003)[14]); (10) they are accountable only to their beneficiaries and not to the public at large or any public official (citing HRS §§ 87A–5,–26,–30,–31 (Supp.2003)[15]); and (11) they are insured at the expense of their beneficiaries (citing HRS § 87A–31(a)).

Plaintiffs argue that the Board is, therefore, more similar to a private or non-profit trust than to a "state board." Plaintiffs, however, do not cite to any statutes or caselaw stating that those characteristics, if true, indicate that the EUTF Board is not a "state board" for purposes of HRS § 26–35.5.

Defendants respond that the following characteristics support their contention that the EUTF Board is a "state board": (1) it was created by, and its methods of operation are controlled by, state statute, HRS chapter 87A; (2) it is attached to the department of

---

with a third-party administrator to administer self-insured benefits."

HRS § 87A–20, which was repealed in 2004, stated that "[p]rocurement of a carrier or third-party administrator for any benefits plan shall be exempt from chapter 103D."

HRS § 87A–24 states:

In addition to the power to administer the fund, the board may:

(1) Collect, receive, deposit, and withdraw money on behalf of the fund;

(2) Invest moneys in the same manner specified in section 88–119(1)(A), (1)(B), (1)(C), (2), (3), (4), (5), (6), and (7);

(3) Hold, purchase, sell, assign, transfer, or dispose of any securities or other investments of the fund, as well as the proceeds of those investments and any money belonging to the fund;

(4) Appoint, and at pleasure dismiss, an administrator and other fund staff. The administrator and staff shall be exempt from chapter 76 and shall serve under and at the pleasure of the board;

(5) Make payments of periodic charges and pay for reasonable expenses incurred in carrying out the purposes of the fund;

(6) Contract for the performance of financial audits of the fund and claims audits of its insurance carriers;

(7) Retain auditors, actuaries, investment firms and managers, benefit plan consultants, or other professional advisors to carry out the purposes of this chapter;

(8) Establish health benefits plan and long-term care benefits plan rates that include administrative and other expenses necessary to effectuate the purposes of the fund; and

(9) Require any department, agency, or employee of the State or counties to furnish information to the board to carry out the purposes of this chapter.

13. HRS § 87A–19 provides in relevant part that "[t]he board may determine eligibility for part-time, temporary, and seasonal or casual employees by rules exempt from chapter 91 as provided in section 87A–26."

HRS § 87A–26 states:

(a) The board may adopt rules for the purposes of this chapter. Rules shall be adopted without regard to chapter 91. Rule-making procedures shall be adopted by the board and shall minimally provide for:

(1) Consultation with employers and affected employee organizations with regard to proposed rules;

(2) Adoption of rules at open meetings that permit the attendance of any interested persons;

(3) Approval of rules by the governor; and

(4) Filing of rules with the lieutenant governor.

(b) The board may also issue policies, standards, and procedures consistent with its rules.

(c) The board may adopt rules, without regard to chapter 91, governing dispute resolution procedures in the event of impasse in decision-making; provided that the rules shall be adopted with the concurrence of six trustees.

14. HRS § 87A–30 stated:

There is established outside the state treasury, a trust fund to be known as the "Hawaii Employer–Union Health Benefits Trust Fund". The fund shall consist of "contributions, interest, income, dividends, refunds, rate credits, and other returns." The fund shall be under the control of the board and placed under the department of budget and finance for administrative purposes.

15. HRS § 87A–31 provided, in relevant part:

(a) The fund shall be used to provide employee-beneficiaries and dependent-beneficiaries with health and other benefit plans, and to pay administrative and other expenses of the fund.

(b) The fund, including any earnings on investments, and rate credits or reimbursements from any carrier or self-insured plan and any earning or interest derived therefrom, may be used to stabilize health and other benefit plan rates; provided that the approval of the governor and the legislature shall be necessary to fund administrative and other expenses necessary to effectuate these purposes.

budget and finance, which means its communications with the legislature, its budget, and its hiring and purchases must go through that department, (citing HRS §§ 87A–26 to–35); (3) it is subject to the public meeting and government record requirements of HRS chapters 92, Public Agency Meetings and Records, and 92F, Uniform Information Practices Act; (4) aside from rulemaking, it is subject to HRS chapter 91; (5) HRS § 87A–26, *supra* note 15, sets the EUTF's rulemaking procedure which requires the EUTF's rules to be approved by the governor; (6) although the EUTF initially had a limited exemption from public procurement laws regarding contracts with insurance carriers, third-party administrators, and professional consultants, such exemption was eliminated in 2004 by Act 216, 2004 Haw. Sess. L. Act 216 § 15 at 993–94; (7) the EUTF serves a public purpose, *i.e.*, the provision of health and other benefit plans for public employees, retirees, and their dependents; (8) its administrative expenses, which include the cost of its insurance, are paid for by the public employers; and (9) its funding largely comes from public employer contributions, which are general funds appropriated as cost items by the legislature, (citing HRS § 87A–32 (Supp.2003) [16] and HRS § 89–10(b) (Supp. 2003) [17]). Defendants, however, also do not cite to any statutes or caselaw supporting their contention that these characteristics, if true, evidence a "state board" within the meaning of HRS § 26–35.5. Nevertheless, we find Defendants' position more persuasive. Indeed, the legislative history of HRS § 26–35.5(b) supports Defendants' position inasmuch as it states that the statute was intended to encourage people such as the Trustees to contribute their knowledge and experience without pay, in the community interest, by protecting them from civil liability:

> The purpose of this bill is ... to exempt from civil liability members of state boards and commissions who serve without pay, unless the member acts with a malicious purpose, in bad faith, or a wilful or wanton manner.

> Your Committee supports protecting "volunteer" boards and commission members from frivolous suits, suits extended as harassment, and more importantly, suits which may be intended to intimidate these persons to influence policies and decisions. *Such protection should encourage more people to contribute their valuable knowledge and experience in the community interest, and promote more open, deliberate policy and decision making in response to the general public.*

Sen. Stand. Comm. Rep. No. 538–84, in 1984 Senate Journal at 1267 (emphasis added). The EUTF Trustees serve on the EUTF Board without pay for the purpose of contributing to the community interest, namely, designing and administering health benefits plans at a cost affordable to both public employers and employees. It is clear that HRS § 26–35.5(b) is intended to protect them. Accordingly, the EUTF Trustees are "members" of a "state board" for purposes of HRS § 26–35.5, and thus, are entitled to immunity from civil suit, unless they acted

---

16. HRS § 87A–32 provides, in relevant part:

> (a) The State, through the department of budget and finance, and the counties, through their respective departments of finance, shall pay to the fund a monthly contribution equal to the amount established under chapter 89C or specified in the applicable public sector collective bargaining agreements, whichever is appropriate, for each of their respective employee-beneficiaries and employee-beneficiaries with dependent-beneficiaries, which shall be used toward the payment of costs of a health benefits plan....

17. HRS § 89–10(b) states:

> All cost items shall be subject to appropriations by the appropriate legislative bodies.

> The employer shall submit within ten days of the date on which the agreement is ratified by the employees concerned all cost items contained therein to the appropriate legislative bodies, except that if any cost items require appropriation by the state legislature and it is not in session at the time, the cost items shall be submitted for inclusion in the governor's next operating budget within ten days after the date on which the agreement is ratified. The state legislature or the legislative bodies of the counties acting in concert, as the case may be, may approve or reject the cost items submitted to them, as a whole. If the state legislature or the legislative body of any county rejects any of the cost items submitted to them, all cost items submitted shall be returned to the parties for further bargaining.

with malicious intent or an improper purpose, as will next be discussed.

### 3. There are no genuine issues of material fact as to whether the Trustees acted with a malicious or improper purpose.

Plaintiffs next argue that there is a question of fact whether the Trustees acted for a "malicious or improper purpose," which would take them outside the immunity provided by HRS § 26–35.5(b). Plaintiffs contend that, pursuant to *Towse v. State*, 64 Haw. 624, 647 P.2d 696 (1982), the issue of whether the Trustees acted for a malicious purpose is determined by a "reasonable person" test.[18] Defendants respond that the "reasonable person" test is inapplicable here, and that there is no evidence that any of the Trustees acted with a malicious or improper purpose.

In order to understand *Towse*, it is helpful to examine *Medeiros v. Kondo*, 55 Haw. 499, 522 P.2d 1269 (1974), which we, in part, relied upon in *Towse*. In *Medeiros*, a civil service employee of the State Department of Taxation brought suit for damages against the director of the department alleging that the director had maliciously and wilfully attempted to force the employee to relinquish his job. *Id.* at 500, 522 P.2d at 1269–70. We rejected the view advanced by federal courts that non-judicial governmental officers are absolutely immune from tort actions, stating that "if an official in exercising his authority is motivated by malice, and not by an otherwise proper purpose, then he should not escape liability for the injuries he causes." *Id.* at 501–03, 522 P.2d at 1270–71. We intended, however, "to limit liability to only the most guilty of officials by holding plaintiff to a higher standard of proof than in a normal tort case." *Id.* at 504–05, 522 P.2d at 1272. To this end, we "allocate[d] to plaintiff the burden of adducing clear and convincing proof that defendant was motivated by mal-

ice and not by an otherwise proper purpose." *Id.* at 505, 522 P.2d at 1272.

Eight years later, we decided *Towse*. Therein, prison guards and their wives brought suit against state officials for, *inter alia*, defamation in connection with a series of incidents during a purported "overhaul" of the Hawai'i State Prison. *Towse*, 64 Haw. at 625, 647 P.2d at 698. In discussing whether the state officials had been motivated by malice, which would strip them of their immunity, we discussed *Medeiros's* malice and improper purpose requirement, noting that "the word malice 'has acquired a plethora of definitions[.]'" *Id.* at 632, 647 P.2d at 702 (quoting *Aku v. Lewis*, 52 Haw. 366, 376, 477 P.2d 162, 168 (1970)). In deciding between adopting the constitutionally-based "actual malice" test[19] and the "reasonable person" test, we chose to apply the latter, which we had previously utilized in *Aku* and *Russell v. Am. Guild of Variety Artists*, 53 Haw. 456, 497 P.2d 40 (1972). According to the "reasonable person" test, "in the instance where malice is alleged to extinguish a qualified privilege, defendant is required to act as a reasonable [person] under the circumstances, with due regard to the strength of his [or her] belief, the grounds that he [or she] has to support it, and the importance of conveying the information." *Towse*, 64 Haw. at 632–33, 647 P.2d at 703 (quoting *Russell*, 53 Haw. at 463 n. 4, 497 P.2d at 45 n. 4 (quoting Prosser, *The Law of Torts*, 795–96 (4th ed.1971))) (quotation signals omitted).

Plaintiffs aver that *Towse* requires this court to apply a "reasonable person" test to the malice requirement of HRS § 26–35.5(b). Because *Towse* is distinguishable, we disagree. *Towse* involved state officials' qualified privilege in a defamation case. Although we discussed *Medeiros* in *Towse*, the rule enunciated in *Towse* arose from *Russell* and *Aku*, both of which were also defamation cases. Indeed, in *Aku*, we stated that "[i]n adopting the standard of reasonable care, we

---

18. Although the *Towse* Court referred to the test as the "reasonable man" test, we refer to the test herein as the "reasonable person" test.

19. We adopted the "actual malice" test in *Tagawa v. Maui Pub. Co., Ltd.*, 49 Haw. 675, 427 P.2d 79 (1967). Therein, malice was defined as "with

knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 683, 427 P.2d at 84 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

conclude that it is in society's interest in these circumstances to make defaming publishers less willing to speak due to the risk of being found negligent." 52 Haw. at 378, 477 P.2d at 169. This reasoning does not apply here. Moreover, in *Russell*, when this court first adopted the "reasonable person" test, quoting it from Professor Prosser, we explicitly recognized in a footnote that Professor Prosser was addressing himself directly to the use of the word malice in the context of the qualified privilege in defamation cases. 53 Haw. at 463 n. 4, 497 P.2d at 45 n. 4; *see* Prosser, *The Law of Torts*, 795–796 (4th ed.1971) (discussing the definition of "malice" in chapter 19, entitled "Defamation"). Furthermore, the language of the test espoused in *Towse*, quoted from *Russell* (requiring a person to act "with due regard to the strength of his [or her] belief, the grounds that he [or she] has to support it, and the *importance of conveying the information* "), clearly was intended for purposes of analyzing the qualified privilege in a claim for defamation, not for immunity pursuant to HRS § 26–35.5. It is therefore apparent that the "reasonable person" test was adopted for use in the defamation context.

The legislative history of HRS § 26–35.5, which makes clear that the legislature did not intend for malice in this context to be defined by the lower standard of the "reasonable person" test, bears repeating:

> The purpose of this bill is ... to exempt from civil liability members of state boards and commission who serve without pay, unless the member acts with a malicious purpose, in bad faith, or a wilful or wanton manner.
>
> Your Committee supports protecting "volunteer" boards and commission members from frivolous suits, suits extended as harassment, and more importantly, suits which may be intended to intimidate these persons to influence policies and decisions. Such protection should encourage more people to contribute their valuable knowledge and experience in the community interest, and promote more open, deliberate policy and decision making in response to the general public.
>
> . . . .

> [Y]our Committee amended the bill to give "volunteer" board and commission members more immunity; it *raised the standard of liability* from an act with a malicious purpose, in bad faith, or a wilful or wanton manner to an act for a malicious purpose or improper purpose.

Sen. Stand. Comm. Rep. No. 538–84 in 1984 Senate Journal at 1267 (emphasis added).

Accordingly, *Towse* and the "reasonable person" test are inapplicable to this case, and the phrase "malicious or improper purpose" should be defined in its ordinary and usual sense. *See* HRS § 1–14 ("The words of a law are generally to be understood in their most known and usual signification, without attending so much to the literal and strictly grammatical construction of the words as to their general or popular use or meaning."). Black's Law Dictionary defines "malicious" as "[s]ubstantially certain to cause injury" and "[w]ithout just cause or excuse." *Black's Law Dictionary* 977 (8th ed.2004). "Malice" is defined as "[t]he intent, without justification or excuse, to commit a wrongful act[,]" "reckless disregard of the law *or* of a person's legal rights[,]" and "[i]ll will; wickedness of heart." *Id.* at 976.

■ With these definitions in mind, we turn to the evidence. Defendants produced evidence that the Trustees adopted the two-tier rate structure for the following nonmalicious and proper reasons:

> ([1]) a two-tier structure would have a negative impact on the smallest percentage of EUTF participants; ([2]) it would avoid the potential of increasing costs for larger families who were the least likely to be able to afford such increases; and ([3]) during a period of uncertainty, it was the most prudent choice to facilitate the collective bargaining that would be necessary to fund the EUTF health benefit plans.

Plaintiffs, however, contend the following demonstrates a "malicious or improper purpose":

> [The Trustees] (1) were unaware of the duty of impartiality, (2) were unaware of the magnitude of the impact of their tiering decision on the Plaintiff class, (3) chose not to obtain that data although it was

readily available, and (4) ignored warnings regarding the inequity of the approach to tiering that they were adopting[.]

Plaintiffs' assertions, even if true, do not evince malice or an improper purpose, while Defendants' contentions provide "just cause" for the Trustees' decision. Plaintiffs do not provide any evidence that any of the Trustees' actions were motivated by ill will or an intention to commit, or a reckless disregard of committing, a wrongful act against any of the employee-beneficiaries. As such, Plaintiffs did not carry their burden of demonstrating "specific facts ... that present a genuine issue worthy of trial." *French*, 105 Hawai'i at 470, 99 P.3d at 1054. Accordingly, the circuit court did not err in awarding summary judgment in favor of Defendants.

C. *Whether Plaintiffs' Claims Against the State Are Barred by Sovereign Immunity*

Plaintiffs next aver that the circuit court erred in awarding summary judgment in favor of Defendants on the basis of the State's sovereign immunity because the State expressly waived its immunity pursuant to HRS § 661–11 (1993) and the STLA, HRS chapter 662.[20] Defendants, for their part, contend that the State retains its immunity because the discretionary function exception to the STLA applies and HRS § 661–11 does not apply. Plaintiffs' arguments are unavailing.

**1. The EUTF Board is an arm of the State for purposes of sovereign immunity.**

█ Preliminarily, Plaintiffs argue that the Board is not an arm of the State and thus, is not entitled to sovereign immunity in the first instance, arguing essentially the same reasons they expressed in support of their argument that the Board is not a "state board" for purposes of HRS § 26–35.5, set forth in Section III.B.2, *supra*. Defendants counter that the State's sovereign immunity

covers boards that, like the EUTF, are attached to executive departments.

Plaintiffs do not cite any statutory authority or caselaw stating that the characteristics they identified, if true, are more persuasive than those identified by Defendants, *see supra* Section III.B.2, in the determination of whether the Board is a private, rather than a governmental entity. Defendants, on the other hand, cite to HRS § 26–35(b) (Supp. 2004), which provides that "[e]very board or commission established or placed within a principal department for administrative purposes or subject to the administrative control or supervision of the head of the department shall be considered an arm of the State and shall enjoy the same sovereign immunity available to the State." Here, the EUTF Board is "placed under the department of budget and finance for administrative purposes." HRS § 87A–30. For their part, Plaintiffs argue that HRS § 26–35(b) was not enacted until 2004, and thus, during the relevant time period (2002–2003), the State's sovereign immunity did not extend to boards that are attached to executive departments. *See* 2004 Haw. Sess. L. Act 16, § 8 at 35 (stating that the effective date is April 23, 2004). Plaintiffs' argument is unavailing.

It appears from HRS § 26–35(b)'s legislative history that the addition of subsection (b) was not intended to *extend* the State's sovereign immunity to administratively-attached boards, but rather, merely to *clarify* that such boards were already entitled to sovereign immunity. *See* Hse. Stand. Comm. Rep. No. 642–04, in 2004 House Journal, at 1655 ("The purpose of this bill is to *clarify* that all administratively-attached boards and commissions are arms of the State and entitled to the same sovereign immunity as the State itself." (Emphasis added.)); Sen. Stand. Comm. Rep. No. 3079, in 2004 Senate Journal, at 1525 ("Your Committee believes that this measure provides *clarification* that all administratively attached agencies are entities of the State and are covered by the state sovereign immunity, despite variances

---

**20.** Defendants mention in passing that breach of fiduciary duty is not a tort claim, thus implying that neither HRS chapter 662 nor HRS § 661–11 would apply, and that the State retains its sovereign immunity. This court, however, has in the

past classified breach of fiduciary duty as a tort claim. *See, e.g., TSA Int'l Ltd. v. Shimizu Corp.*, 92 Hawai'i 243, 264, 990 P.2d 713, 734 (1999) ("TSA's claims for fraud and breach of fiduciary duty sound in tort.").

in their powers or duties." (Emphasis added.)). As such, the fact that the subsection was not enacted until 2004 does not mean that administratively-attached boards prior to that were not arms of the State entitled to sovereign immunity. *See Brown v. Thompson*, 374 F.3d 253, 259 (4th Cir.2004) (relying on legislative history to determine whether amendment changes or merely clarifies existing law); *City of Colorado Springs v. Powell*, 156 P.3d 461, 465 (Colo.2007) (stating that presumption that "by amending the law the legislature has intended to change it" can be rebutted "by a showing that the legislature meant only to clarify an ambiguity in the statute by amending it"); *Carter v. California Dept. of Veterans Affairs*, 38 Cal.4th 914, 922, 44 Cal.Rptr.3d 223, 135 P.3d 637, 642 (2006) ("In deciding the amendment's application, we must explore whether the amendment changed or merely clarified existing law. A statute that merely clarifies, rather than changes, existing law is properly applied to transactions predating its enactment." (Citation omitted.)). Accordingly, we hold that the EUTF Board is an arm of the State entitled to assert the defense of sovereign immunity.

### 2. Plaintiffs' claim against the State for vicarious liability for the Trustees' choice of a two-tier rate structure is barred by the State's sovereign immunity because the design and structure of the health plan is a broad policy matter which is a "discretionary function" within the meaning of HRS § 662-15(1).

 Plaintiffs next argue that their claim against the State for vicarious liability for the Trustees' choice of a two-tier health plan rate structure is not barred by the discretionary function exception to the State's waiver of its sovereign immunity. We disagree.

 "[I]t is well established that the State's liability is limited by its sovereign immunity, except where there has been a 'clear relinquishment' of immunity and the State has consented to be sued." *Taylor-Rice v. State*, 105 Hawai'i 104, 109-10, 94 P.3d 659, 664-65 (2004) (citation omitted). HRS § 662-2 (1993) provides that "[t]he State hereby waives its immunity for liability for the torts of its employees and shall be liable in the same manner and to the same extent as a private individual under like circumstances[.]" Notwithstanding this general waiver of immunity, HRS § 662-15 (1993) provides, in relevant part, that:

> This chapter shall not apply to:
>
> (1) Any claim based upon ... the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state officer or employee, whether or not the discretion involved has been abused[.]

This portion of section 662-15(1) is generally referred to as the "discretionary function exception," and, if a government actor's decision or conduct falls within that exception, chapter 662 does not apply and the State retains its immunity. The purpose of the discretionary function exception is to "recognize[ ] the separate powers and functions of the legislative and executive branches of state government and protect[ ] them from any attempted disturbance through the courts." *Breed v. Shaner*, 57 Haw. 656, 666, 562 P.2d 436, 442 (1977).

 Our precedent makes clear that, in deciding whether actions of State officials fall within the discretionary function exception, we must "determine whether the challenged action involves the effectuation of a 'broad public policy[,]' on the one hand, or routine, 'operational level activity[,]' on the other." *Tseu ex rel. Hobbs v. Jeyte*, 88 Hawai'i 85, 88, 962 P.2d 344, 347 (1998). Operational level acts are "those which concern routine, everyday matters, not requiring evaluation of broad policy factors." *Breed*, 57 Haw. at 666, 562 P.2d at 442.

In *Julius Rothschild & Co. v. State*, 66 Haw. 76, 80, 655 P.2d 877, 881 (1982), this court held that the State's decision not to reconstruct the Moanalua Stream Bridge to conform to a fifty-year flood criterion constituted a discretionary function. The project involved a "costly reconstruction of a two-span permanent concrete structure which is presently an integrated part of a heavily-travelled highway." *Id.* We stated that whether such a project should be authorized would require "a weighing of priorities at the higher levels of government, and would surely entail evaluations based on financial, politi-

cal and economic considerations." *Id.* at 80–81, 655 P.2d at 881. Other activities we have deemed to involve the evaluation of broad policy factors, and are therefore discretionary, include "a decision to purchase certain aircraft, a decision to activate an airbase, [and] a decision not to build a prison." *Breed*, 57 Haw. at 667, 562 P.2d at 443 (footnotes omitted).

On the other hand, activities we have deemed operational include the decision to improve guardrails, *Taylor–Rice*, 91 Hawai'i at 78, 979 P.2d at 1104 (rejecting the State's argument that "the decision to improve guardrails, like the decision not to reconstruct a bridge in *Julius Rothschild*, involves the evaluation of broad policy considerations"); and decisions regarding the placement of road signs and the painting of road stripings, *Rogers v. State*, 51 Haw. 293, 298, 459 P.2d 378, 381 (1969) ("[S]uch matters as the kinds of road signs to place and where to place them, and which center line stripings to repaint and when to repaint them, did not require evaluation of policies but involved implementation of decisions made in everyday operation of governmental affairs.").

Here, the decision about the structure of the EUTF health benefits plans clearly was not a routine, everyday matter, but involved the evaluation of broad policy factors including: (1) the percentage of employee-beneficiaries that would be adversely affected by a change to the various rate structures; (2) the fact that a four-tier structure would increase the costs for those least able to afford it, *i.e.*, families with two or more dependents; (3) the potential impacts of adopting tier structures that were new and could complicate the collective bargaining process, which was geared to a two-tier structure, thus possibly leading to employee-beneficiaries having to pay the full cost of their premiums; and (4) the possibility of a strike. In sum, the Trustees' decision to adopt a two-tier rate structure falls within the discretionary function exception.

3. **HRS § 661–11 does not save Plaintiffs' claim against the State for vicarious liability for the Trustees' breach of fiduciary liability.**

Plaintiffs next contend that, pursuant to HRS § 661–11, even if the discretionary function exception applies with respect to their claim against the State for vicarious liability for the Trustees' breach of fiduciary liability, the State's sovereign immunity was nevertheless waived by the purchase of fiduciary liability insurance, *see supra* Section I.A, as was required to be procured by HRS § 87A–25(4), *supra* note 5.

HRS § 661–11, entitled "Tort claims against State where covered by insurance," provides:

This section applies to an action where (1) the State is a party defendant; (2) the subject matter of the claim is covered by a primary insurance policy entered into by the State or any of its agencies; and (3) chapter 662 does not apply. No defense of sovereign immunity shall be raised in an action under this section. However, the State's liability under this section shall not exceed the amount of, and shall be defrayed exclusively by, the primary insurance policy.

An action under this section shall not be subject to sections 661–1 to 661–10.

(Emphasis added.) Whether or not the State's sovereign immunity is waived pursuant to HRS § 661–11 with respect to Plaintiffs' claim against the State for vicarious liability, as discussed in Section III.A, *supra*, the Trustees' choice of a two-tier rate structure was not an abuse of discretion. As such, the Trustees did not breach a fiduciary duty, and thus, the State cannot be vicariously liable therefor. In sum, the applicability of HRS § 661–11 is immaterial to this case.

4. **Plaintiffs' claim against the State for negligent training must fail because it is dependent upon a breach of duty by the Trustees.**

Plaintiffs also assert that their claim against the State for negligent training or advice is not barred by the State's sovereign immunity. HRS § 87A–9 (Supp.2001) states that "[t]he attorney general shall serve as legal adviser to the board...." Plaintiffs allege that the Attorney General "negligently performed its duties as [the EUTF's] adviser

with respect to the fiduciary duties of the . . . trustees," which resulted in a breach of fiduciary duty owed by the Trustees to Plaintiffs and others similarly situated. Plaintiffs further allege that "[w]hen a person in a fiduciary relationship to another violates his duty as a fiduciary, a third person who has notice that the trustee is committing a breach of trust and participates in the violation of duty is liable to the beneficiary." (Citing Restatement (Second) of Trusts § 326 (1959)). Thus, Plaintiffs contend, "if the Attorney General knew or should have known that the [T]rustees were ignoring or were ignorant of their fiduciary duties to Plaintiffs and sat silent, and if that advice or lack of advice/training was a substantial factor contributing to the [T]rustees' breach of their fiduciary duties, . . . the State is liable for the Attorney General's misconduct or lack of training. . . ."

Plaintiffs' assertions are premised on the conclusion that the Trustees breached a fiduciary duty. Because, as discussed in Section III.A, *supra*, the Trustees did not breach a fiduciary duty, Plaintiffs' claim against the State for negligent training or advice must fail. Thus, the circuit court did not err in awarding summary judgment on this claim in favor of Defendants.

D. *Although Plaintiffs' Claims for Declaratory and Prospective Relief are Not Barred by Sovereign Immunity, Such Relief is Not Warranted Because the Trustees' Did Not Abuse Their Discretion in Adopting the Two–Tier Rate Structure.*

Plaintiffs' Second Amended Complaint sought, *inter alia*, declaratory and injunctive relief prohibiting the two-tier rate structure and requiring the Trustees to solicit proposals for multi-tier health plans, to adopt the most advantageous proposal, and to obtain training on the nature of their fiduciary duties. Defendants concede that Plaintiffs' claims for declaratory and injunctive relief are not barred by either sovereign immunity, *see Office of Hawaiian Affairs v. State*, 110 Hawai'i 338, 357, 133 P.3d 767, 786 (2006) ("[S]overeign immunity may not be invoked by the State if the suit seeks 'prospective,' *i.e.*, injunctive, relief and the State fails to carry its burden of proving with specific facts that the effect on the State treasury will be directly, substantially, and quantifiably impacted."), or the Trustees' HRS § 26–35.5(b) immunity. Because, as discussed in Section III.A, *supra*, the Trustees did not abuse their discretion in adopting the two-tier structure, Plaintiffs' arguments that the Trustees should be (1) prohibited from adopting a two-tier system, (2) required to solicit proposals for multi-tier health plans, and (3) required to obtain training on the nature of their fiduciary duties, are unavailing.

## V. *CONCLUSION*

Based on the foregoing, we affirm the circuit court's February 24, 2005 judgment.

Concurring Opinion by MOON, C.J.

I concur in the result only.